IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Boyer, et al.,            )
                          )
    Plaintiffs,       )
                          )
v.                        )   C.A. No. 06-694-GMS
                          )
Taylor, et al.,           )
                          )
    Defendants.       )

FILED
JUL 30 2007
RG scgw
U.S. DISTRICT COURT
DISTRICT OF DELAWARE

**MOTION FOR RECONSIDERATION
IN LIGHT OF WILKINSON V. AUSTIN**

Comes now plaintiff Amir Fatir, pursuant to Fed. R. Civ. P., Rule 59(e), and request this honorable court to reconsider its dismissal of Count 17 of the complaint (D.I. 10) in the above entitled case.

In Count 17 Fatir complained of being placed in SHU Supermax and MHU for 13 months without a hearing as a violation of his constitutional rights. He cited the Fourteenth Amendment and the Eighth Amendment to the U.S. Constitution.

The Court relied upon *Sandin v. Conner*, 515 U.S. 472 (1995) for its reasoning.

The Court's reliance upon *Sandin* was misplaced. A more appropriate case for the Court to have used would have been *Wilkinson v. Austin*, 125 S. Ct. 2384. In light of *Wilkinson*, the court's dismissal of count 17 should be reconsidered.

The Delaware SHU Supermax conditions are nearly identical to those of the Ohio State Prison ("OSP") Supermax which was the subject of *Wilkinson*.

The 6th Circuit affirmed the District Court's conclusion that inmates have a liberty interest in avoiding OSP placement. According to *Wilkinson*:

Inmates have a constitutionally protected liberty interest in avoiding assignment at OSP. Such an interest may arise from state policies or regulations, subject to the important limitations set for in *Sandin*, which requires a determination whether OSP assignment "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." 515 U.S., at 483, 115 S.Ct. 2293. The Court is satisfied that assignment to OSP imposes such a hardship compared to any plausible baseline from which to measure the Ohio prison system. For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; his cell's light may be dimmed, but is on for 24 hours; and he may exercise only one hour per day in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in segregated confinement at issue in Sandin, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. Taken together these conditions impose an atypical and significant hardship within the correctional contact. Pp. 2393-2395.

The OSP operated according to two policies, the Old Policy and then the New Policy. Under each, there were several review levels, opportunities to learn why one was

being sent to OSP. The New Policy required more procedures and protections before a prisoner was placed in OSP.

DCC's SHU Supermax, unlike OSP, afforded no review levels, hearings, notifications or procedures for Fatir's placement in SHU. He was placed there arbitrarily at the whim and fancy of his jailers after having committed no infraction, violated no rule or having even been accused of any rule infraction.

The Court appears to be of the opinion that the Warden can do to a prisoner whatsoever he happens to think of doing on a particular day for no particular reason. In a prison like DCC – with an overwhelmingly Black population and an exclusively White administration – such reasoning seems to be the intellectual and moral child of the infamous Dred Scott decision which held that "a black man has no rights that a white man is bound to respect." Perhaps unwittingly, the Court has invested the Warden of the institution with unprecedented imperial powers of a scope unheard of since the Magna Carta checked King John on June 15, 1215.

DCC's SHU Supermax provides no protection against improper placement inside SHU.

The Court wrote that "neither Delaware law nor DCC regulations create a liberty interest in a prisoner's classification within an institution" (MEMORANDUM, page 13).

Left to the magnanimity of tough-on-crime legislators and prison officials, prisoners would have no liberty interests whatsoever.

Liberty interests are derived from the Constitution and – despite widespread usurpation of judicial powers and judges' apparent terror at being labeled "liberal" should they dare to defy the prosecutorial weltanschauung – determination of liberty interests

3

and constitutional rights is solely the prerogative of the judiciary, not that of law makers (legislative branch) or prison administrators (functionaries of the executive branch).

In Marbury v. Madison, 5 U.S. 137, the Supreme Court assumed all powers of judicial review. "The question, whether an act, repugnant to the constitution, can become the law of the land, is a question deeply interesting to the United States; but, happily, not of an intricacy proportioned to its interest." Marbury, supra.

"It is emphatically the province of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret the rules. If two laws conflict with each other, the courts must decide on the operation of each." Marbury, supra, at 177.

This court cannot, therefore, abdicate its own responsibilities or authorities by construing a lack of liberty interests because the other two branches of government failed to grant them. It is not within the scope of their authorities to either grant or deny rights which derive from the Constitution. That authority rests upon the shoulders of this court.

With elections being seized by candidates' brothers, executive branch officials opening flouting wiretapping laws and the FISA courts and state legislators drafting and passing laws to overturn State Supreme Court decisions (e.g., Evans v. State), this nation stands at the precipice of real constitutional crises. The slow, inexorable erosion of judicial powers during the past three decades has thrown a system – totally dependent upon checks and balances – woefully out of balance.

Fatir's classification points (then 9) were far beneath the level required for SHU placement. Moreover, DOC prisoners are required at least the statutorily required steps of appearing before the MDT (Multi-Disciplinary Team) and CICC (Central

4

Classification Committee) before any change in classification. To afford the required steps to 99.9 % of the population but to deny that same procedural due process to Fatir is a violation of the 14th Amendment's guarantee of equal protection whoever the court or the administration chooses to slice and dice it.

"Inmates have a protected liberty interest in avoiding assignment at OSP. We further hold that the procedures set forth in the New Policy are sufficient to satisfy the Constitution's requirements." *Wilkinson*, at 2393.

Implicit in the *Wilkinson* holding above is that some procedures must exist for lawful Supermax placement. Fatir was placed in Supermax punitive solitary confinement lockdown without the benefit of even the constitutionally infirm procedures of OSP's Old Policy.

Fatir was put in Supermax without any policy, procedure, review, classification, hearing or notification whatsoever. Such a violation of due process is barely tolerated even at Guantanamo Bay.

Even this court has held that "[A]bsent an unusual circumstance, the Due Process Clause requires that, prior to the imposition of solitary confinement, an inmate must at least be given notice of the charge against him and an opportunity to tell his side of the story." *Johnson v. Anderson*, 370 F. Supp. 1373, 1379 (1974, D. Del.).

Fatir was not given notice of any charge against him nor an opportunity to question or challenge his placement in SHU which is solitary confinement cubed (i.e., to the third power).

SHU is a punitive housing unit that is used for disciplinary purposes. It also houses death row and the hole (isolation) in building 18. Fatir was originally placed in

5

the hole (Building 18) and was moved to a similar hole -- that wasn't called the hole -- in Building 19 some days later.

SHU inmates endure under the constant threat of police attack; they live in extreme cold conditions brought on by the air conditioners which flow even during Winter months and they are not allowed to block their vents which chill their cells or remain under blankets to attempt to derive some warmth; they get no outside air or sunlight except on the days they are able to get outside for an hour – and that is if they are one of the first two to get their rooms opened for recreation.

Out of 168 weekly hours, SHU inmates are locked within their cells for 166 of them and more if – as happens frequently – the jailers say they are understaffed or that existing staff are needed for some other job within the institution. At such times the paltry one recreational/shower hour is lost.

Recreation and showers are to be conducted during the one hour (twice weekly) and men are handcuffed behind their backs by at least two hostile officers each time their doors are opened and they must go everywhere – including to visits and to the showers and to see their attorneys – shackled behind the back under the prodding of two hostile, attack-ready prison guards.

Recreation consists of a small, cement, fenced-in area approximately 40 square feet in which the prisoner can walk or job. There is no basketball or any time of recreational material. If a man must urinate while on recreation, then he has to urinate upon himself for the police do not open doors until recreation is done and will write the prisoner up for indecent exposure if he relieves himself upon the concrete.

SHU has driven many a prisoners insane and has aggravated pre-existing mental health conditions and turned prisoners with some maladaptive behaviors into full-blown nut jobs.

SHU prisoners can only spend $5 biweekly for commissary and that $5.00 must cover postage stamps, envelopes, ink pens, paper and any hygiene items needed as well as any food.

Fatir's wife resides in England and, during his SHU time, a first class letter to England cost $0.80. At most he could send six letters to his wife every 14 days if he spent his entire allotment only upon stamps.

Fatir made several requests to be permitted to purchase more stamps or to send out letters via pay-to voucher. All such requests were denied and pay-to vouchers were returned to Fatir with his letters unsent. This included even mailings to the courts and legal mail to attorneys.

By its limitation upon lawful, protected communication, Fatir's SHU placement violated his First Amendment right to freedom of speech, his First Amendment right to petition government for redress of grievances and his Sixth Amendment right of access to the courts.

Upon information and belief, Fatir was put in SHU largely as punishment for his having filed and settled a lawsuit against the prison administration for, inter alia, retaliating against him by sending him to Arizona. The Administration sought to quell any future legal challenges on the part of Fatir and other prisoners by making sure that other prisoners were aware that even if a prisoner was exiled for exercising his supposed Constitutional rights he would still have to face the powers of his jailers upon his return.

7

Such actions might indeed chill any verbal dissent, complaint or civil actions to courts which have evidenced a complete unwillingness to protect prison litigants if not outright compliance with them.

The point system criteria for Supermax placement and the fact that it is solely for punitive, disciplinary housing implies the existence of some type of state policy and procedure, however lacking and inadequate. That gives rise to a liberty interest in avoiding those particular conditions of confinement.

The Court's reliance upon *Sandlin* is, in this case, misplaced for *Sandlin* dealt with the relatively short (30 days or less) stay in Administrative Segregation while SHU placement can be for years or even for the duration of a prisoner's natural life.

WHEREFORE, plaintiffs ask this honorable court to reconsider its dismissal of Count 17 and allow plaintiffs to proceed on that Count.

Respectfully submitted,

Amir Fatir
pro se

Warren Wyant

Donald Boyer

## Certificate of Service

I, Amir Fatir, hereby certify that I have served a true and correct copy(ies) of the attached Motion for Reconsideration upon the following parties/persons:

To: Beau Biden, Esq.

    Attorney General of Delaware

    Department of Justice

    820 N. French Street

To: Wilmington, DE 19801

To:

To:

To:

To:

BY PLACING IN A SEALED ENVELOPE, and depositing same in the United States Mail at the Delaware Correction Center, Smyrna, DE 19977.

On this 25th day of July, 2007

Amir Fatir
SBI # 137010

```
IM  Amir Fatir
SBI# 137010  UNIT W-C-18
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977
```

Legal Mail

Clerk
U.S. District Court
844 King St., Lockbox 18
Wilmington, DE 19801