## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD BOYER, AMIR FATIR, and )
WARREN WYANT, )
         )
         Plaintiffs, )
         )    C.A. No. 06-694-GMS
      v. )
         )    Jury Trial Requested
COMMISSIONER STANELY TAYLOR, et al., )
         )
         Defendants. )

### STATE DEFENDANTS' RESPONSE IN OPPOSITION TO
### PLAINTIFF FATIR'S MOTION FOR A TEMPORARY RESTRAINING
### ORDER AND/OR A PRELIMINARY INJUNCTION TO PERMIT
### PLAINTIFF FATIR TO RECEIVE REJECTED BOOKS [RE: D.I. 118]

COMES NOW, State Defendants Thomas Carroll, Ronald Hosterman, David

Pierce, Jeanette Havel, Janice Henry, Michael Little, Floyd Dixon, Marvin Creasy, James

Satterfield, Maureen Whelan, Ralph Bailey, and David Hall (the "State Defendants"), by

and through their undersigned counsel, and hereby respond in opposition (the

"Response") to Plaintiff Fatir's Motion for a Temporary Restraining Order and/or a

Preliminary Injunction to Permit Plaintiff Fatir to Receive Rejected Books (the "Motion

to Receive Books") (D.I. 118). State Defendants assert that the Court should deny

Plaintiffs' Motion because Plaintiff Fatir cannot show that he is likely to succeed on the

merits of his claim or that he will suffer irreparable injury if his request to receive books

is denied. In support of the Response, State Defendants state as follows:

       1.     Plaintiffs Donald Boyer, Amir Fatir, and Warren Wyant (the "Plaintiffs")

are all inmates presently incarcerated at the Delaware Correctional Center ("DCC") in

Smyrna, Delaware.  Plaintiffs are appearing *pro se* in this matter with leave to proceed *in forma pauperis*.

2.      On November 15, 2006, Plaintiffs, along with nine (9) other individuals who have since been dismissed from the case, filed a Complaint against 25 Defendants alleging various claims.  (D.I. 10).

3.      Less than two months later, on January 5, 2007, Plaintiff Boyer filed the First Amended Complaint against all of the defendants adding new claims and allegations.  (D.I. 18).  On July 30, 2007, Plaintiffs filed a Second Amended Complaint further refining their allegations and claims against the defendants.  (D.I. 43).

4.      Following the filing of their Second Amended Complaint, the Plaintiffs, led by Plaintiff Fatir, filed a series of five motions requesting injunctive relief for various issues.  State Defendants filed a response in opposition to each of the five motions.  The Court denied all five of the Plaintiffs' motions in an order dated March 28, 2008.  (D.I. 112).

5.      Less than one month following the Court's decision, on April 21, 2008, the Plaintiffs, again led by Plaintiff Fatir, filed the Motion to Receive Books.  In the Motion to Receive Books, Plaintiff Fatir claims that this Court should grant him injunctive relief because the DCC has "prevented [him] from receiving the following publications:  The Catcher in the Rye, Natural Cures They Don't Want You to Know About, Ishmael, The Multi-Orgasmic Woman and Shakti:  the Feminine Power of Yoga." (D.I. 112 at ¶ 1).

6.      State Defendants assert that the Court should deny the Motion to Receive Books because the Plaintiff cannot prove he is likely to succeed on the merits of his First

Amendment claim. Moreover, the Motion should be denied because Plaintiff Fatir will not suffer irreparable harm if he does not receive the already rejected books.

7.     A grant of injunctive relief is an extraordinary remedy. Thus a request for injunctive relief should only be granted in limited circumstances. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989).

8.     The Third Circuit holds that a district court should grant a request for a preliminary injunction only if "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998). An injunction should only issue if all four factors favor relief. *See S & R Corporation v. Jiffy Lube International, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).

9.     To obtain a preliminary injunction Fatir must satisfy all four factors. If he cannot prove that he has a likelihood of success on the merits of his claim or that he is likely to suffer irreparable injury, the request for preliminary injunction should be denied. *See Instant Air*, 882 F.2d at 800.

## I.     Fatir Is Not Likely To Succeed On The Merits Of His First Amendment Claim.

10.     The first factor of the preliminary injunction test requires that the moving party show that he is likely to succeed on the merits of his claims. *Maldonado*, 157 F.3d at 184. To establish a valid claim under § 1983, a plaintiff must demonstrate that the defendants, while acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States. *Moore v. Tartler,* 986 F.2d 682, 685 (3d Cir. 1993). In this case Fatir did not file a grievance regarding the alleged unlawful

denial of the books.  Therefore Fatir has not met the requirements, under the PLRA, for

filing a section 1983 action.  Moreover, Fatir cannot show that the State Defendants

deprived him of a right secured by the First Amendment.  Therefore he is not likely to

succeed on the merits of his claims and the Court should deny the Motion for his failure

to satisfy the first factor for injunctive relief.

> **A.** **Fatir did not comply with the requirements of the PLRA when he
> failed to file a grievance regarding the alleged denial of the requested
> books**.

11.    Title 42, Section 1997e(a) of the United States Code, as amended by the

PLRA, states that, "No action shall be brought with respect to prison conditions under

section 1983 of this title, or any other Federal law, by a prisoner confined in any jail,

prison, or other correctional facility until such administrative remedies as are available

are exhausted."  42 *U.S.C.* § 1997e(a).  "Exhaustion is now required for all action[s]

brought with respect to prison conditions."  *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

12.    The exhaustion requirement "applies to all inmate suits about prison life,

whether they involve general circumstances or particular episodes, and whether they

allege excessive force or some other wrong."  *Id.* at 532.  Congress's purpose in enacting

the mandatory exhaustion requirement is to "eliminate unwarranted federal-court

interference with the administration of prisons,…."  *Woodford v. Ngo*, -- U.S. --, 126

S.Ct. 2378, 2387 (2006).  Thus the exhaustion requirement, "afford[s] corrections

officials time and opportunity to address complaints internally before allowing the

initiation of a federal case."  *Porter*, 534 U.S. at 525.

13.    DCC has a grievance process and procedure that is codified at DOC

Procedure Number 4.4 which is entitled "Inmate Grievance Procedure."  (Exhibit A).

Under Procedure 4.4, an inmate who wishes to grieve a particular issue must first express the grievance in writing.

14.     In this case Plaintiff Fatir did not file a single grievance regarding the alleged denial of "The Catcher in the Rye", "Ishmael" or "The Multi-Orgasmic Woman". As such Fatir failed to exhaust his available administrative remedies.  Therefore, Fatir cannot succeed on the merits of his claim regarding the alleged denial of these books and the Motion to Receive Books should be denied.

      **B.**    **Fatir's First Amendment rights have not been violated where the policy prohibiting the requested books satisfies the *Turner* test.**

15.     Assuming, *arguendo*, that Fatir can show that he exhausted all administrative remedies prior to filing the Complaint or this Motion this Court should still deny the Motion to Receive Books because Fatir cannot prove the State Defendants violated his First Amendment rights.

16.     "'[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.'"  *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).  Included in the rights prisoners retain are the protections of the First Amendment.  *Id.*  But "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'"  *Id.* (quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).  Thus the Supreme Court has held that, "'when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.'"  *Williams v. Morton*, 343 F.3d 212, 216 (3d Cir. 2003) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

17.    To determine if a prison regulation is reasonably related to a legitimate penological interest a court must weigh four factors:

> (1) whether there is a valid, rational connection between the prison regulation and a neutral and legitimate government interest; (2) whether there are alternative means of exercising the right in question; (3) the impact that accommodation of the asserted constitutional right would have on guards and other inmates; and (4) whether there are adequate alternatives to meet the prison's objectives.

*Jolly v. Snyder*, 2003 WL 1697539, at *2 (D. Del. March 22, 2003) (citing *Turner*, 482 U.S. at 89-91) (Exhibit B).

18.    In *Jolly v. Snyder*, inmates at the Delaware Correctional Center filed a lawsuit against various prison officials seeking damages for alleged violation of their First and Fourteenth Amendment rights. At issue was DCC's prior incoming publications policy which prohibited inmates from "receiving through the mail any materials that exhibit, either through photograph or written representation, sexually explicit acts or nudity." *Id.* at *1. The defendant DCC officials filed a motion to dismiss the plaintiffs' claims arguing that the prison policy was reasonably related to a legitimate government interest and satisfied the *Turner* test. *Id.* at *2. In upholding the policy and granting the officials' motion to dismiss this Court found that the policy "clearly lies within the boundaries of what the Supreme Court and other courts have deemed legitimate policies…." *Id.* at *5.

19.    In this case Fatir asserts that the State Defendants used DCC's current incoming publication policy to deny him the book "Shakti: The Feminine Power of

Yoga".[1]  Shakti is a book that contains nothing but nude pictures of women in yoga positions.  In denying Shakti, the DCC found that the book was "sexually explicit and/or obscene and is, therefore, not conducive to the goal of rehabilitation."  (Exhibit D).  The DCC also found that the book "presents risks to institutional safety and security."  (*Id.*).  The book was found to violate Department of Correction Policy 4.5 regarding incoming publications and was denied.  (*Id.*).

20.    The new policy used to deny Fatir the Shakti book is very similar to the old policy upheld in *Jolly*.  The current policy for handling incoming publications – Policy 4.5 – states that, "Inmates may receive publications as long as they are not determined to be detrimental to the security, discipline, or good order of the prison; do not facilitate criminal activity; and are not prohibited by law."  (Exhibit E).  Publications may be rejected if they "depict, describe or contain: … [s]exually explicit material." (*Id.*).  A publication may also be denied if it depicts, describes or contains, "Activities that may lead to physical violence or group disruption."  (*Id.*).

21.    Like the policy in *Jolly*, Policy 4.5 satisfies the four prong *Turner* test. Therefore the State Defendants have not violated Fatir's First Amendment rights and he is unlikely to succeed on the merits of his claim.

22.    The first factor of the *Turner* test requires the court to consider whether there is a valid, rational and neutral connection between the policy and a legitimate

---

[1] Fatir has no proof that the rest of the books were ever ordered or denied.  Fatir has no evidence that he ever ordered "The Catcher in the Rye" or "Ishmael".  Fatir's Motion showed that "Natural Cures They Don't Want You To Know About" was never received by the DCC mailroom.  (Exhibit to Plaintiffs' Motion also attached hereto as Exhibit C). Finally, there is no evidence that the book The Multi Orgasmic Woman was ever ordered or denied.  Fatir's records show that the book "The Big O" was received by the mailroom on December 14, 2005.  Fatir does not complain about being denied "The Big O".

government interest.  "Neutrality in the *Turner* context means that the purpose of limiting access to certain material is not the suppression of expression but some other legitimate purpose."  *Jolly*, 2003 WL 1697539, at *3.

23.     Policy 4.5 is patterned after the Federal Bureau of Prisons' policy and is designed to "balance the promotion of education and literacy with the institution's responsibility to provide a safe and secure facility."  (Exhibit F at ¶ 2).  The policy is necessary for the safety and security of DCC and to prevent the trading, bartering and selling of sexually explicit material.  Sexually explicit material that is traded, bartered or sold could wind up in the hands of sex offenders and rapists.  (*Id.* at ¶ 4).  Such material is contrary to the rehabilitation of these individuals.  In addition, sexually explicit materials may contribute to other unacceptable and dangerous behaviors among the prisoners.  (*Id.*).

24.     Policy 4.5 is not designed to suppress expression.  Rather the purpose of the policy is to balance the "inmates' right to receive information with the prisons' responsibility to provide safe and secure correctional facilities."  (Exhibit E).  In light of the aforementioned reasons and because similar policies have been found to have valid rational connections to legitimate government interests, this Court should find that Policy 4.5 meets the first prong of the *Turner* test.

25.     The second factor of the *Turner* test requires a court to consider whether the inmates have an alternative means of expression.  In weighing this factor "the question is not whether the prisoners have other opportunities to read pornographic materials, but whether they have the opportunity to read in general."  *Jolly,* 2003 WL 1697539 at *4.

26.    Policy 4.5 does not ban all reading materials.  Rather it limits certain materials that an inmate may receive.  Further, while Fatir claims he was denied the requested books, he has not asserted that he has been denied any and all books, magazines or publications.  Therefore inmates, including Fatir, are given alternative means of expression and the second factor is satisfied.

27.    The third *Turner* factor involves analyzing the impact that accommodation would have on guards and other inmates.  In considering this factor the court must look at the possible "ripple effects" that allowing the inmate to have the requested material would have on other inmates.  *See Turner*, 482 U.S. at 92.

28.    In this case permitting some inmates to have a book like Shakti would lead to a great ripple effect.  Policy 4.5 is designed, in part, to prevent sex offenders and rapists from receiving sexually explicit material.  (Exhibit F at ¶ 4).  Permitting some inmates to have these materials could lead to the materials being traded, bartered or sold.  Thus while only certain inmates would be permitted to have the material it could still wind up in the hands of inmates who were denied the material.  As the court stated in the *Jolly* case, "In the prison context, it may be impossible to exclude materials based, for example, on whether the prisoner is a sex offender or not because the ease of passing materials from one prisoner to another makes segregation of these materials impossible."  *Jolly*, 2003 WL 1697539 at *4.  Allowing some inmates to have these materials but prohibiting others would not solve the "ripple effect" problem and would put the safety and security of the institution in danger.  In light of the dangerous ripple effect and the potential danger that permitting Fatir to have the Shakti book could cause, the third factor of the *Turner* test is satisfied.

29.     Finally, in considering the fourth *Turner* factor, the Court must determine whether the plaintiff has proven "that an adequate alternative of reaching the prison's objective exists." *Id.* at *5.  In this case Fatir has not offered a single adequate alternative to Policy 4.5 that would have a narrower application and still meet the DCC's goals.  As the Court in *Jolly* stated, "Defendants' policy of reviewing each publication individually is the narrowest application of the policy available." *Id.*  Given that the Plaintiff has not offered any adequate alternative, the final *Turner* factor is met.

30.     Policy 4.5 satisfies the *Turner* four part test.  Given that the policy satisfies the standard, and in consideration of this Court's previous decision in *Jolly*, this Court should find that Policy 4.5 does not violate Fatir's First Amendment rights. Therefore Fatir is not likely to succeed on the merits of his claim.

**II.  Fatir Cannot Prove He Will Suffer Future Irreparable Harm If His Ability To Immediately Receive The Already Rejected Books Is Denied.**

31.     Aside from not satisfying the first factor for injunctive relief, Fatir also cannot show that he will suffer irreparable injury if his Motion is denied.  To demonstrate irreparable injury a plaintiff must prove "more than a *risk* of irreparable harm …." *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980) (emphasis added).  Injunctions are not issued to eliminate a possibility of a remote future injury.  *Id.*  Rather, an injunction is used where the movant has shown that he "is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued." *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985). Moreover, injunctive relief is used to prevent definite future harms, not to remedy past violations.  *See SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).

32.     Fatir cannot show that he is in danger of suffering irreparable harm by being denied the right to immediately read "The Multi-Orgasmic Woman", "Shakti: the Feminine Power of Yoga" or any of the other requested books. In fact, neither the Motion nor Fatir's Opening Brief in Support of the Motion mentions that he will suffer any type of irreparable injury from being denied the books.

33.     Moreover, the Motion seeks to remedy past violations – not future injuries – which is contrary to the purpose of injunctive relief. The books Fatir requests have already been denied by the DCC. Fatir has not shown that he has purchased a book that will likely be denied by the prison in the future. Therefore Fatir cannot prove that he will suffer a future injury that requires injunctive relief and his Motion should be denied.

WHEREFORE, State Defendants respectfully request that this Honorable Court enter an Order, substantially in the form attached hereto, dismissing Plaintiff Fatir's Motion to Receive Books.

**STATE OF DELAWARE**
**DEPARTMENT OF JUSTICE**

*/s/ Erika Y. Tross*
Erika Y. Tross (#4506)
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302)577-8400
        Attorney for State Defendants

Dated: May 8, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DONALD BOYER, AMIR FATIR, and | ) | |
| WARREN WYANT, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | C.A. No. 06-694-GMS |
| v. | ) | |
| | ) | Jury Trial Requested |
| COMMISSIONER STANELY TAYLOR, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**<u>ORDER</u>**

Upon Plaintiff Fatir's Motion for a Temporary Restraining Order and/or a

Preliminary Injunction to Permit Plaintiff Fatir to Receive Rejected Books (D.I. 118) (the

"Motion"); and State Defendants' Response in Opposition to the Motion; and it appearing

that good and sufficient notice of the Plaintiff's Motion and the State Defendants'

Response in Opposition has been given; and after due deliberation thereon:

**IT IS HEREBY ORDERED** that the Motion is **DENIED.**

SO ORDERED this _____ day of _____, 2008.

_____
The Honorable Gregory M. Sleet
United States District Court Judge

## <u>CERTIFICATE OF SERVICE</u>

I, Erika Y. Tross, Esq., hereby certify that on May 8, 2008, I caused a true and

correct copy of the attached ***State Defendants' Response in Opposition to Plaintiff***

***Fatir's Motion for a Temporary Restraining Order and/or a Preliminary Injunction to***

***Permit Plaintiff Fatir to Receive Rejected Books [Re: D.I. 118]*** to be served on the

following individuals in the form and manner indicated:

**NAME AND ADDRESS OF RECIPIENT(S):**

**<u>Via First Class Mail</u>**

Donald Boyer
SBI # 082420
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

Warren Wyant
SBI # 00176129
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

Amir Fatir
SBI # 137010
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

**<u>Via Electronic Delivery</u>**
James E. Drnec, Esq.
Balick & Balick, LLC
711 King Street
Wilmington, DE 19801

*/s/ Erika Y. Tross*
Erika Y. Tross (#4506)
Deputy Attorney General
Delaware Department of Justice
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-8400

# EXHIBIT A

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| | 4.4 | 1 OF 7 |
| BUREAU OF PRISONS | RELATED ACA STANDARDS: 36 | |
| PROCEDURE MANUAL | | |
| CHAPTER: 4 DECISION-MAKING RELATING TO INMATES | SUBJECT:   INMATE GRIEVANCE PROCEDURE | |
| APPROVED BY THE CHIEF, BUREAU OF PRISONS: | | |
| EFFECTIVE DATE: Revised 5/15/98 | | |

I.   **AUTHORITY:**  DOC Policy 4.4

II.  **PURPOSE:**

To establish an Inmate Grievance Procedure designed to reduce tension in correctional facilities and to effectively resolve the vast majority of cases within our system.  Every inmate will be provided a timely, effective means of having issues brought to the attention of those who can offer administrative remedies before court petitions can be filed. NOTE:  Inmates are encouraged to seek their counselors' advice on how to best pursue a response to concerns before prematurely filing a grievance under the guidelines that follow.

III. **APPLICABILITY:**

All BOP employees, volunteers, persons or organizations conducting business with the BOP: all inmates under BOP custody or supervision.

IV.  **DEFINITIONS:**

A.   Bureau Grievance Officer (BGO):  A BOP employee who reviews and mediates appeal of the Warden's/Warden's Designee decision.

B.   Emergency Grievance:  An issue that concerns matters which under regular time limits would subject the inmate to a substantial risk of personal, physical or psychological harm.

C.   Grievance:  A written complaint concerning the substance or application of a policy or practice; any action toward an inmate by staff or other inmates; any condition or incident within the institution that affects an inmate.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| BUREAU OF PRISONS | 4.4 | 2 OF 7 |
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

D.  Inmate Grievance Chair (IGC):  An institutional
    employee designated to handle inmate grievances.

E.  Inmate Grievance Procedure (IGP):  The formal process
    provided to inmates to resolve disputes.

F.  Outside Reviewer:  An individual not associated with
    DOC who hears inmate grievance appeals referred by the
    BGO and Bureau Chief of Prisons.

H.  Resident Grievance Committee (RGC):  A committee
    comprised of institutional staff and inmates that hears
    inmate grievances and makes a recommendation to the
    Warden/Warden's Designee.

I.  Reprisal:  Any action or threat of action against
    inmates or staff based solely on their participation or
    use of the IGP.

J.  Medical Grievance Committee (MGC): An institution's
    specific medical review authority comprised of a
    minimum of three medical services contractual staff
    from the following list:

        Health Services Administrator
        Director of Nursing
        Charge Nurse
        Chief Medical Officer
        Medical Records Clerk
        Mental Health Counselor
        Chief Dental Officer
        Dental Assistant

V.  PROCEDURE:

1.  Copies of the IGP shall be available in each
    institutional housing unit, in each library, in each
    counselor's office, and in each IGC office.

2.  All inmates, regardless of physical condition/security
    status/administrative status, shall be entitled to use
    the IGP.  Inmate complaints regarding policies and
    conditions must be within DOC jurisdiction.  This
    includes actions by employees, inmates, and incidents
    occurring within the institution that affect them
    personally.  NOTE: Policies that have their own formal
    appeal mechanisms are not grievable through the IGP.
    Specifically excluded from the IGP are issues
    concerning Disciplinary, Classification, and Parole

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| BUREAU OF PRISONS | 4.4 | 3 OF 7 |
| SUBJECT:   INMATE GRIEVANCE PROCEDURE | | |

Board decisions.

3.   The IGP shall afford the grievant a meaningful remedy. Relief may include an agreement by the Warden/Warden's Designee to remedy an objectionable condition within a reasonable, specified time period; change in institutional policy or practice; or restitution.

4.   The IGP prohibits reprisals against staff or inmates for their use or participation in the process.   If either participant experiences adverse reactions, they may appeal directly to the Warden/Warden's Designee. The Warden/Warden's Designee shall offer a written response within 10 calendar days upon receipt of the appeal.   This decision is appealable to the Bureau Chief of Prisons for final disposition.

5.   No staff or inmate named as a party to the grievance shall participate in any capacity in the resolution decision.   This instruction includes contact for purposes of information gathering not merely decision making.   Grievances filed against the IGC or appealing authority shall be referred to the next higher authority.

6.   All grievances shall be kept separate from the inmate's master file.   Neither staff or inmates shall have access to these records except to the extent necessary for clerical processing, resolution, or decision compliance.

7.   The maximum period between initial grievance receipt and final appeal response shall not exceed 180 calendar days.   If a full RGC cannot be convened as scheduled, another hearing shall be rescheduled within 7 calendar days.

8.   Inmates are prohibited from submitting more than one grievance arising from a single incident.

9.   If more than one inmate files a grievance on the same incident, the IGC will consolidate the staff investigations and RGC hearings into a single "group grievance".   All individuals involved will be notified by the IGC.

| STATE OF DELAWARE<br>BUREAU OF PRISONS | PROCEDURE NUMBER:<br>4.4 | PAGE:<br>4 OF 7 |
|---|---|---|
| SUBJECT:   INMATE GRIEVANCE PROCEDURE | | |

10.  The IGC shall provide a copy of the response to each IGP step to the grievant within 7 calendar days of IGC receipt.

11.  The RGC shall be comprised of two inmates who are elected by a majority vote from their own housing unit and two staff designated by the Warden/Warden's Designee.  Designated staff should include custody and treatment staff, as well as, those who have frequent contact with the grievant's housing unit.  Each RGC member has one vote; the IGC shall only vote to break a tie.

12.  Inmate RGC members and two inmate alternates shall serve for a term of six months.  Staff RGC members serve at the discretion of the Warden/Warden's Designee.  One staff member shall be from Treatment and one from Security.

13.  The RGC shall deliberate on its findings and forward its recommendation to the Warden/Warden's Designee.

14.  All investigative work must be completed and documented prior to the RGC hearing.

15.  Inmates are allowed to retract a grievance at any time during the process by written notice to the IGC.

16.  The IGC shall submit a monthly IGP status report to the BGO and the Bureau Chief of Prisons.

17.  The BGO and the Bureau Chief of Prisons share responsibility for IGP revisions/amendments. Distribution to all points of inquiry listed in #01 above shall be the responsibility of the Warden/Warden's Designee.

18.  Remedies which are dependent on departments or agencies outside of the DOC may require more time for coordination of implementation steps.  The IGC shall notify the grievant of the implementation plan and schedule upon receipt of written notification of concurrence by the outside entity.

19.  The specific duties of the IGC and BGO are listed in the "Inmate Grievance Procedure Training Manual". Analysis of their performance is the sole responsibility of their immediate supervisors.

| STATE OF DELAWARE | PROCEDURE NUMBER: | PAGE: |
|---|---|---|
| BUREAU OF PRISONS | 4.4 | 5 OF 7 |
| SUBJECT:   INMATE GRIEVANCE PROCEDURE | | |

## IGP RESOLUTION LEVELS

**Level I (Informal Resolution):**

The IGP process begins when an inmate files Form #584.  The grievant must complete this form within 7 calendar days following the incident and forward to the IGC.  The IGC shall forward the grievance to the inmates' housing unit supervisors within two days of their receipt.  Housing unit supervisors shall investigate, document all findings on Form #175, attempt resolution and report results to the IGC within 3 calendar days of their receipt of the grievance.  Resolution ends the IGP process; the IGC closes the file and monitors issues of compliance.  Unresolved grievances are referred to Level II administration.

**Level II (RGC Recommendation/Warden's Decision):**

The RGC will convene within 30 calendar days of IGC receipt of the grievance to examine the issue and documented investigative data from Form #175, hear testimony, and make a recommendation. The Grievant will be offered the opportunity to participate in the RGC hearing through examination of all information presented and discussion with all participants.  The RGC shall ask any question it feels relevant to the issue.  If the RGC determines that further investigation is required it may grant an additional five days, by majority RGC member vote and grievant consent, to complete its work.  All RGC work is to be documented and forwarded to the IGC on Form #584 RGC Recommendation.  The IGC forwards the RGC recommendation to the Warden/Warden's Designee. The Warden/Warden's Designee responds on Form #584 within 10 calendar days and forwards that response to the IGC for distribution.  If the Warden/Warden's Designee and grievant concur with the RGC recommendation the grievance is deemed resolved; the IGC closes the file and monitors issues of compliance.  If there is no concurrence, the case is referred to Level III administration.

**Level III (The Final Decision):**

The BGO will review the grievance file upon receipt.  Concurrence with the Warden/Warden's Designee decision and signature by the BGO and Bureau Chief of Prisons ends the IGP process; the IGC closes the file and monitors issues of compliance.  At the BGO's discretion, mediation between grievant and the Warden/Warden's Designee may be attempted or Outside Review recommended.  The BGO shall recommend Outside Review in only those instances where interpretation of law or expansion of policy are necessary.  The Bureau Chief of Prisons may accept or reject the BGO's written

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 6 OF 7 |
|---|---|---|
| SUBJECT:    INMATE GRIEVANCE PROCEDURE | | |

recommendation.  Decisions by the Bureau Chief of Prisons are final and not open to grievant interpretation.  The Bureau Chief of Prisons will return his final decision and the grievance file to the IGC for closure and monitoring for issues of compliance.

**Emergency Grievance:**

Issues that concern substantial risk of personal, physical or psychological inmate injury shall be addressed immediately by the Warden/Warden's Designee.  A copy of the grievance shall be sent to the IGC upon receipt by the Warden/Warden's Designee.  And the Warden/Warden's Designee shall respond within one calendar day.  Grievant appeals of the Warden/Warden's Designee decision will be decided by the Bureau Chief of Prisons within one calendar day upon receipt of the emergency appeal.  NOTE: If the Warden/Warden's Designee should determine that the grievance does not meet the emergency criteria, the grievance shall be returned to the inmate for processing through the normal IGP process steps.

**Medical Grievance:**

All medical grievances must be submitted to the Inmate Grievance Chairperson (IGC) at the respective institution on Form #585.  If, by chance, an inmate sends a grievance directly to the medical services contractual staff, they are to forward it first to the IGC who will log it in the institution's grievance log and then return it to the medical services contractual staff for action.

The appropriate medical staff will review the grievance and denote actions taken on the Medical Log Form #586

The medical services contractual staff will attempt an informal resolution with the inmate, upon discussion over the treatment defined on the Medical Log Form.  If the Medical Grievance is resolved the inmate acknowledges this by his signature on Form #585 Informal Resolution.  This signed form is forwarded to the IGC who will close out the case.

Failure to resolve the grievance informally, results in a Medical Grievance Committee hearing which will not include any medical services contractual staff previously involved in the informal resolution process.  The IGC and the inmate must be present at this hearing.

Resolution closes the case; failure to resolve the case results in the inmate completing the MGC Appeal Statement section of Form #585.  Upon receipt, the IGC forwards the file to the Bureau

| STATE OF DELAWARE BUREAU OF PRISONS | PROCEDURE NUMBER: 4.4 | PAGE: 7 OF 7 |
|---|---|---|
| SUBJECT: INMATE GRIEVANCE PROCEDURE | | |

Grievance Officer (BGO). The BGO recommends a course of action to the Bureau Chief of Prisons, who renders a final decision.

**Universal Grievance:**

Issues that concern the entire system and not just one inmate, a group of inmates, or one institution shall be presented by the BGO to the Bureau Chief of Prisons.

**Institutional Transfer:**

When possible, transfers shall be delayed for any inmate who has filed a grievance and been notified of an RGC hearing date until the hearing has concluded. If circumstance requires immediate transfer, the IGC at the institution where the grievant filed will proceed in the grievant's absence utilizing the normal IGP process steps through Level II. The Warden/Warden's Designee decision will be forwarded to the IGC at the grievant's new location for review. If the grievant appeals to Level III, the IGC at the grievant's new location shall forward the file to the IGC at the original location for BGO review. Grievances filed against the sending institution after an inmate's transfer, but inside the standard seven day window following an incident, shall be forwarded by the IGC at the new location to the IGC at the original location for processing.

**Appeals:**

Grievant appeals must be signed, dated and state the specific reasons on Form #584 Grievance Appeal. This form must be given to the IGC who is responsible for tracking the status of each grievance. The IGC will forward the appeal and grievance file to the BGO. Grievants shall have 3 calendar days upon receipt of their copy of the Warden/Warden's Designee decision to appeal, as well as, to include any additional information for review at the next level. NOTE: The Bureau Chief of Prisons decisions are final and not appealable.

Attachments

# EXHIBIT B



Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)**

**C**Jolly v. Snyder
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Allen JOLLY, Mark Kirk, Vincent Warren, Thomas
Manger, Juan Garcia, and John Schmitz, Plaintiffs,
v.
Robert SNYDER, Stan Taylor, Elizabeth Burriss,
Larry McGuigan, Francene Kobus, Ron Hosterman,
and Thomas Carroll, Defendants.
**No. C.A. 00-041-JJF.**

March 22, 2003.

Allen Jolly, Mark Kirk, Vincent Warren, Thomas
Manger, Juan Garcia and John Schmitz, pro se
Plaintiffs.
Stuart B. Drowos, Deputy Attorney General,
Delaware Department of Justice, Wilmington,
Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.
**\*1** Pending before the Court is Defendants' Motion to
Dismiss (D.I.35). For the reasons discussed below,
Defendants' Motion to Dismiss will be granted.

BACKGROUND

*1. Facts*

This is a civil rights case filed by Plaintiffs, **inmates**
at the Delaware Correctional Center ("DCC"),
against Defendants, Department of Corrections
("DOC") employees. *See* Complaint, D.I. 2. Plaintiffs
seek compensatory and punitive damages for a prison
policy that allegedly denies Plaintiffs their **First
Amendment** right of free expression and Fourteenth
Amendment right of due process. *See* Complaint, D.I.
2 at 3a; Motion to Supplement Complaint, D.I. 12.
The prison policy in question forbids **prisoners** from
receiving through the mail any materials that exhibit,
either through photographic or written representation,
sexually explicit acts or nudity (the "policy").*See*
Defendants' Memorandum of Points and Authorities
in Support of their Motion to Dismiss, D.I. 36,

Exhibit A4. There is an exception in the policy for
material containing nudity "illustrative of medical,
educational, and anthropological content and material
of a news information type."*Seeid.*Plaintiffs complain
that (1) their right to free expression under the **First
Amendment** has been violated; (2) the policy is
overbroad because it **prohibits** receipt of **materials**
that do not contain **sexually explicit** representations;
and (3) that they are not notified of the rejection of
magazines or other **materials** and do not have an
opportunity to appeal rejection decisions, thereby
violating the Plaintiffs' right to due process under the
Fourteenth Amendment. *See* Complaint, D.I. 2 at 3a;
Motion to Supplement Complaint, D.I. 9 at 1-2;
Motion to Supplement Complaint, D.I. 12.
Defendants move to dismiss the Complaint for failure
to state a claim under Federal Rule of Civil Procedure
12(b)(6).

*2. Legal Standard*

The instant Motion to Dismiss is brought under Rule
12(b)(6) of the Federal Rules of Civil Procedure. The
purpose of a motion to dismiss pursuant to Rule
12(b)(6) is to test the legal sufficiency of a complaint.
Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Strum
v. Clark, 835 F.2d 1009, 1011 (3d Cir.1987). In
reviewing a motion to dismiss for failure to state a
claim, "all allegations in the complaint and all
reasonable inferences that can be drawn therefrom
must be accepted as true and viewed in the light most
favorable to the non-moving party."*Strum, 835 F.2d
at 1011;see also Jordan v. Fox, Rothschild, O'Brien &
Frankel, 20 F.3d 1250, 1261 (3d Cir.1994).* This is
especially true when the complaint is made
*prose.SeeEstelle v. Gamble, 429 U.S. 97, 106 (1976).*
A court may dismiss a complaint for failure to state a
claim only if it is clear that no relief could be granted
under any set of facts that could be proved consistent
with the allegations. *Hishon v. King & Spalding, 467
U.S. 69, 73 (1984); Jordan, 20 F.3d at 1261.*

DISCUSSION

*1. Contentions*

**\*2** By their motion, Defendants contend that the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Complaint should be dismissed for a number of reasons. First, Defendants contend that Plaintiffs' **First Amendment** claim should be dismissed because Defendants' policy is reasonably related to a legitimate and neutral penological interest and thus complies with *Turner v. Safley*, 482 U.S. 78 (1987). Second, Defendants contend that Plaintiffs' Due Process claim should be dismissed because Defendants have provided adequate safeguards by providing notice of confiscation of publications and by affording an opportunity to appeal such decisions. Additionally, Defendants assert various immunity defenses: (1) Defendants cannot be sued in their official capacities under the doctrine of sovereign immunity and the Eleventh Amendment; and (2) Defendants cannot be sued in their individual capacities under the doctrine of qualified immunity unless Plaintiffs can show that Defendants should have been aware that their actions violated clearly established constitutional rights. Finally, Defendants contend that the Section 1983 claim is invalid because (1) State officials acting in their official capacities are not "persons" for the purpose of Section 1983 claims and therefore are not subject to liability under it; (2) the doctrine of *respondeat superior* is not available in Section 1983 claims and therefore Plaintiffs have no claim against Defendants in their supervisory capacities unless they can show that Defendants acted with deliberate indifference and that their actions were causally related to the injury; and (3) Plaintiffs have failed to show personal involvement or knowing acquiescence of the alleged constitutional deprivation and negligence alone is not a cognizable claim under Section 1983.[FN1]

> FN1. Although Plaintiffs have not asserted a pendent state claim, Defendants in their Memorandum in Support of their Motion to Dismiss (D.I.36, ¶ 17) contend that this would also fail because the State Tort Claims Act, 10 *Del. C.* § 4001(3), shields Defendants from personal liability for acts done in good faith and without gross or wanton negligence arising out of the performance of their official discretionary duties.

Plaintiffs respond that (1) the *Turner v. Safley* requirements are not met because Defendants have failed to show that the policy is reasonably related to a legitimate penological interest; (2) the policy is overbroad as written and in its application, resulting in confiscation of materials that are not sexually explicit and resulting in the receipt of these publications by some **inmates** and not by others; and (3) the procedural safeguards that are in place do not provide adequate notice or an opportunity to be heard. Finally, in response to the immunity defenses, Plaintiffs argue that (1) the Eleventh Amendment does not bar law suits against Defendants in their individual capacities under Section 1983; and (2) the qualified immunity defense is unavailable as Defendants should have been aware that they were violating Plaintiffs' right to due process under the Fourteenth Amendment and to free expression under the **First Amendment**.

### 2. *First Amendment Claim*

Plaintiffs' **First Amendment** claim asserts that Defendants' policy of excluding certain materials from the prison does not meet the "reasonably related to legitimate penological interests" test of *Turner v. Safely*, 482 U.S. 78 (1987). To determine whether a prison regulation is "reasonably related to legitimate penological objectives," courts weigh four factors: (1) whether there is a valid, rational connection between the prison regulation and a neutral and legitimate government interest; (2) whether there are alternative means of exercising the right in question; (3) the impact that accommodation of the asserted constitutional right would have on guards and other **inmates**; and (4) whether there are adequate alternatives to meet the prison's objectives. *See id.* at 89-91.In *Turner*, the Supreme Court upheld a policy prohibiting **inmate** to **inmate** correspondence unless those **inmates** were family members or were corresponding concerning legal matters. *See id* . at 81-82.In so holding, the Supreme Court took notice of two important principles. First, that federal courts should consider valid constitutional claims of prison **inmates**, and second, that courts should accord substantial deference to administrators who are in a better position to deal with the problems of prison administration. *See id.* at 84-85.

### A. Valid, Rational Connection

*3 Defendants argue that the policy is necessary to maintain prison security and to further rehabilitative goals. Specifically, Defendants urge that possession of pornographic materials by **prisoners**, especially

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)

sex offenders, can lead to sexual harassment of female officers and can undermine the safety of both prison guards and other **inmates**. Courts have held that these security and rehabilitation concerns are legitimate penological interests. See*Thornburgh v. Abbott,* 490 U.S. 401, 415 (1989); *Turner,* 482 U.S. at 91-92;*Mauro v. Arpaio,* 188 F.3d 1054, 1059 (9th Cir.1999). Accordingly, in the instant case, the Court concludes that the security and rehabilitative goals advanced by Defendants are legitimate penological interests.

The interest must also be neutral. See*Turner,* 482 U.S. at 89-90. Neutrality in the *Turner* context differs in meaning from the content-neutral requirement of the **First Amendment**. See*Amatel v. Reno,* 156 F.3d 192, 196 (D.C.Cir.1998). Neutrality in the *Turner* context means that the purpose of limiting access to certain material is not the suppression of expression but some other legitimate purpose. *Seeid.*In the instant case, censorship of materials containing sexually explicit content is certainly not content-neutral in a **First Amendment** sense; however, the Court concludes it appears neutral and for the legitimate purpose of security and rehabilitation.

Plaintiffs argue that the policy cannot be legitimate as there is no evidence that incidents of sexual harassment directed toward female prison guards have occurred at the prison. Nevertheless, a prison policy, such as the one in the instant case, need not be made following a determination that possible risks associated with the prohibited materials have already come to fruition, or even that such risks are likely to happen. Rather, an administrator of penal institution need only ascertain that admitting the materials would create an "intolerable risk of disorder" in the prison. See*Thornburgh,* 490 U.S. at 416;*Mauro,* 188 F.3d at 1060. In the Court's view, Defendants are in a better position to ascertain whether the materials at issue in the instant case create an intolerable risk of disorder, and thus, the Court finds Plaintiffs' argument unpersuasive.

Plaintiffs also argue that the prison policy is overbroad because it excludes more material than needed to adequately meet the prison objectives.[FN2]Plaintiffs argue that magazines, such as issues of *Maxim* and *Stuff,* that do not contain sexually explicit material or nudity have been excluded for some **prisoners** but allowed for others.

Courts have held that the discretion necessarily afforded prison administrators may result in inconsistencies in the application of a policy due to the variability within an institution, and therefore such inconsistencies alone are not necessarily signs of arbitrariness or irrationality. See*Thornburgh,* 490 U.S. at 417 n. 15. Also, the Court notes that true consistency could be obtained only through a more restrictive policy that would exclude publications by title rather than on a case-by-case basis. *Seeid.*Further, it may be that a broader exclusion would fail the "alternative means" prong of the *Turner* test and be vulnerable to an overbreadth attack. *Seeid.*

> FN2. Overbreadth analysis occurs under both the first and fourth prongs of the *Turner* test. Under the first prong, an overbreadth argument is used to cast doubt upon the purported legitimate interest at stake. Thus, a policy that excludes material far beyond what is needed to further the purported goals may belie the true, perhaps non-legitimate, policy. Under the fourth prong, overbreadth arguments are used to show that there are alternative means to combat the legitimate goals. Thus, if the policy operates to exclude materials beyond which the policy was meant to exclude, this may be evidence that the policy was not written narrowly enough and that there are alternative means to reach the same goal.

*4 Plaintiffs also argue that *Aiello v. Litscher,* 104 F.Supp.2d 1068 (W.D.Wis.2000), in which a policy restricting sexually explicit material and material containing nudity was struck down, supports their overbreadth argument. The policy in *Aiello* failed because it was so broad that materials such as a representation of Michelangelo's Sistine Chapel were excluded. *Seeid.* at 1079.The court concluded that a policy that led to exclusion of works of art and literature could not possibly be related to security and rehabilitation interests. *Seeid.* at 1080.In the instant case, there is no such allegation that works of art have been excluded. Rather, the prison policy at issue exempts from exclusion any materials that, despite containing sexually explicit content or nudity, have some independent scientific, artistic or anthropological worth. Therefore, the Court concludes that the *Aiello* decision is inapposite to the

Not Reported in F.Supp.2d                                                                                    Page 4
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)**

instant case. For these reasons, and because policies very similar to the one at issue have been found to have a valid, rational connection to a legitimate government interest, the Court concludes that the policy satisfies the first prong of the *Turner* test. See*Thornburgh,* 490 U.S. at 404;*Mauro,* 188 F.3d at 1058;*Amatel,* 156 F.3d at 201;*Smith v. Donohue,* 1992 U.S.App. LEXIS 25066 (7th Cir.1982); *Trapnell v. Riggsby,* 622 F.2d 290 (7th Cir.1980).

### B. Alternatives for Exercising Right

The second prong of the *Turner* test is whether the **prisoners** have alternative means of expression. See*Turner,* 482 U.S. at 92. Whether there are other means of expression should be viewed "sensibly and expansively." See*Thornburgh,* 490 U.S. at 417. In *Turner,* the Court did not require that the **prisoners** be afforded other means of communicating with **prisoners,** but that they be afforded the means of communicating in general beyond the narrow prohibition. *Turner,* 482 U.S. at 92. In the instant case, the question is not whether the **prisoners** have other opportunities to read pornographic materials, but whether they have the opportunity to read in general. Plaintiffs have not complained that they are denied all opportunities to read other materials. Therefore, the Court concludes that the policy satisfies the second prong of the *Turner* test.

### C. Impact

In analyzing the impact that accommodation of the right would have on third parties such as prison guards and other **inmates,** courts must consider possible "ripple effect[s]." *Turner,* 482 U.S. at 92. In the prison context, it may be impossible to exclude materials based, for example, on whether the **prisoner** is a sex offender or not because the ease of passing materials from one **prisoner** to another makes segregation of these materials impossible. In the instant case, Defendants point out that, although sex offenders are housed separately, sex offenders integrate with the general prison population during meals, exercise, library hours and other recreational activities. Authorizing receipt of materials by some **prisoners** yet prohibiting receipt by others on an individualized basis would not solve the "ripple effect" problem and would come at the high cost of significantly less liberty and safety for prison guards and other **prisoners.** *See*id.Therefore, the Court

concludes that the policy satisfies the third prong of the *Turner* test.

### D. Alternative Means

*5 Plaintiffs have the burden of proving that an adequate alternative of reaching the prison's objective exists. See*Mauro,* 188 F.3d at 1062. The prison need not have adopted the least restrictive alternative to achieve its objective. See*Turner,* 482 U.S. at 90, 93 n.*. Plaintiffs claim that the policy excludes certain magazines, such as *Stuff* and *Maxim,* which do not contain sexually explicit materials or nudity. However, in *Amatel,* the court noted that overbreadth claims on the "margin of pornography" have faired poorly. See*Amatel,* 156 F.3d at 201. *Amatel* relied on *Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 61 (1976), which stated, "there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between porn and artistic expression than in the free dissemination of ideas of social and political significance."*Id.* In *Amatel,* the court held that, in order for the scope of the regulation of expression to render it unconstitutional, the overbreadth must be real and substantial. See*Amatel,* 156 F.3d at 201 (quoting *Osborne v. Ohio,* 495 U.S. 103, 112 (1990)). In the instant case, Plaintiffs have not presented an adequate alternative that would have a narrower application. Defendants' policy of reviewing each publication individually is the narrowest application of the policy available. Plaintiffs' contention that the policy is applied inconsistently could be remedied only by wholesale exclusion of certain publications by title, which would lead to exclusion of individual issues that would otherwise have been acceptable under the policy. For these reasons, the Court concludes that the policy satisfies the fourth prong of the *Turner* test.

Because Defendants' policy clearly lies within the boundaries of what the Supreme Court and other courts have deemed legitimate policies, and because Plaintiffs have failed to demonstrate an adequate alternative, the Court will dismiss Plaintiffs' **First Amendment** claim.

### 3. Due Process Claim

Plaintiffs contend that their right of due process has been violated, because they receive no notice of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)

exclusion of prepaid magazines and because they have no means to appeal. In response, Defendants point to the language of the prison policy, in existence since since 1987, that provides for written notice and procedures for appeal. D.I. 38, C-4. Defendants also point to exhibits submitted by Plaintiffs that show both notice to Plaintiffs and correspondence between Plaintiffs and the Warden regarding an appeal.

In *Procunier v. Martinez,* 416 U.S. 396 (1974), the Supreme Court held that decisions by prison officials to withhold delivery of letters required minimum procedural safeguards, including notification to the **inmate** of the confiscation and a reasonable opportunity to protest the decision. *See id.* at 418-19.The Supreme Court recognized that the interest in uncensored communication by letter was a liberty interest, grounded in the **First Amendment,** protected by the Fourteenth Amendment despite the obvious qualifications of necessity due to prison circumstances. *See id.*Thus, the liberty interest is protected from arbitrary government invasion. *See id.*Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of pendency of action."*SeeSullivan v. Barnett,* 139 F.3d 158, 172 (3d Cir.1998). Additionally, the right to be heard must "be granted at a meaningful time and in a meaningful manner to comply with the due process clause."*See id.* at 174.In the instant case, notice is provided to **prisoners** immediately after any negative evaluation of materials received through the mail, and **prisoners** have the option to send the publication to an outside source or donate it. (D.I.37, Ex. R-10). Additionally, within five days of receipt of the notification, **prisoners** may appeal the decision. *Id.* Plaintiffs argue that the notification letter does not contain the option to appeal and therefore does not provide a reasonable opportunity to be heard. Although the notification letter does not expressly explain the option to appeal, the prison policy explicitly lays out the appeal procedure. (D.I. 38, Ex. C-1 to 4). Additionally, Plaintiffs have utilized the appeal process in the past and have engaged in dialogue with prison officials regarding specific decisions to exclude materials. (D.I. 40, Ex. D-2; D.I. 37, Ex. R-1 to 4).

**\*6** Because Plaintiffs are notified of confiscation in a timely manner, have a right to appeal, and have actually utilized the appeal process, the Court concludes there is no due process violation, and accordingly will dismiss the Plaintiffs' due process claim.

*4. Affirmative Defenses*

Plaintiffs have brought this action against Defendants in both their official capacities and in their individual capacities. All Defendants are employees of the State of Delaware and are state actors. Defendants assert affirmative defenses to Plaintiffs' claims in both their individual capacities and their official capacities.

*A. Sovereign Immunity Under the Eleventh Amendment*

Under the Eleventh Amendment, a state may not be sued in a federal court without its consent. U.S. Const., amend. 11. When an individual who works for the state is sued in their official capacity, the reality is that it is the state that will pay damages. Therefore, when an individual who works for the state is sued in their official capacity, it is the state, not the individual, being sued. *SeePagano v. Hadley,* 535 F.Supp. 92, 97 (D.Del.1982). The Eleventh Amendment thus bars lawsuits against state actors in their official capacities in a federal court. In the instant case, the Court concludes that Plaintiffs' cause of action against Defendants in their official capacities violates the Eleventh Amendment and must be dismissed.

*B. Qualified Immunity*

Under the doctrine of qualified immunity, state officials may not be sued in their individual capacities for actions made during the performance of their official duties unless the conduct violated "clearly established" rights. *SeeAnderson v. Creighton,* 483 U.S. 635, 639 (1987). In analyzing whether an official is protected by qualified immunity, liability for allegedly unlawful actions turns on the "objective reasonableness" of the action "assessed in light of legal rules that were clearly established at the time action was taken."*See id.*The contours of the right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right."*See id* . at 640.This does not mean that the prison official must know that a general right under the **First Amendment** exists or that a general right to due process exists, but that the right

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)**

is clearly established in a "more particularized ... and more relevant sense ."*Seeid.*In the instant case, the prison officials, in order to be liable, must have known that their particular actions, confiscating magazines containing sexually explicit material and nudity, violated the First or Fourteenth Amendment. The Court concludes that Defendants could not have known that their policy violated Plaintiffs' rights, because similar policies had been upheld by the United States Supreme Court and other courts in the past.

Because the Court has decided that Plaintiffs' rights were not in fact violated, and because, even if Plaintiffs' rights were violated, Defendants could not have known in light of precedent that they were violating Plaintiffs' rights, the Court concludes that the doctrine of qualified immunity shields Defendants from liability in their individual capacities for action taken during the performance of their official duties.

CONCLUSION

**\*7** For the reasons discussed, Defendants' Motion to Dismiss will be granted.

An appropriate Order will be entered.

D.Del.,2003.
Jolly v. Snyder
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C



**STATE OF DELAWARE**
**DEPARTMENT OF CORRECTION**
**DELAWARE CORRECTIONAL CENTER**
**1811 PADDOCK ROAD**
**SMYRNA, DELAWARE 19977**
**SUPPORT SERVICES DEPARTMENT**

*January 25, 2006*

TO:    *Amir Fatir*
       *SBI#: 137010*

FROM:  Stacy Shane
       Support Services Secretary

RE:    LETTER

---

*I contacted the mailroom regarding your book that was deemed obscene.*
*The name of the book was the Big O and it was disposed of on 1/3/06 cause*
*they never received anything from you regarding what you wanted them to*
*do with it. It was written up and given to you on 12/14/05.*

*The other book, Natural cures they don't want you to know about; was never*
*received per the mailroom.*

/ss

CC:  File

# EXHIBIT D

*Exhibits — Letters to Permit Faith*
*To Receive Books*



D2

STATE OF DELAWARE
DEPARTMENT OF CORRECTION
**OFFICE OF THE WARDEN**
**DELAWARE CORRECTIONAL CENTER**
1181 Paddock Road
SMYRNA, DELAWARE 19977
Telephone: (302) 653-9261
Fax: (302) 653-2855

**MEMORANDUM**

TO:        ~~Inmate Amir Fatir AKA Sterling Hobbs          SBI # 00137010~~
           ~~D East Building~~

FROM:    Thomas L. Carroll, Warden – DCC     *Thomas L. Carroll*

DATE:    June 1, 2007

RE:        Publication Appeal

This will acknowledge receipt of the Rejected Publication Appeal Form you submitted on May 25, 2007 regarding the denial of the publication "Shakti: The Feminine Power of Yoga" due to a violation of the Department of Correction Policy 4.5 regarding incoming publications.

You should be advised that the rejected publication contains material that is sexually explicit and/or obscene and is, therefore, not conducive to the goal of rehabilitation. Additionally, material of this type also presents risks to institutional safety and security.

Based on these factors, the appeal is denied.

CC    Deputy Warden Burris
       Deputy Warden Pierce
       Major Dave Holman
       Major James Scarborough
       Support Services Manager Tonya Smith
       Support Services Officer Carol Powell
       File

# EXHIBIT E

# Summary of DOC Policy # 4.5 – Policy for Incoming Publications
### *effective March 14, 2007*

The Delaware Department of Correction has implemented a new policy with respect to incoming publications, which balances inmates' right to receive information with the prisons' responsibility to provide safe and secure correctional facilities.

This policy covers: books; booklets; pamphlets, or similar documents; single issues of magazines, periodicals, newsletters, and newspapers; as well as other materials addressed to a specific inmate, such as advertising brochures, flyers and catalogs.

Inmates may receive publications as long as they are not determined to be detrimental to the security, discipline, or good order of the prison; do not facilitate criminal activity; and are not prohibited by law.

Only the Warden/Warden's Designee may reject a publication. Publications may be rejected if they depict, describe or contain:

- Procedures for the construction or use of weapons, ammunition, bombs or incendiary devices;
- Methods of escape from correctional facilities or blueprints or descriptions of DOC institutions;
- Procedures for brewing alcoholic beverages or manufacturing drugs;
- Encoded messages;
- Activities that may lead to physical violence or group disruption;
- Encouragement or instruction of commission in criminal activity;
- Sexually explicit material (e.g., sado-masochism; bestiality; involving children).

Publications may not be rejected solely because they contain offensive, controversial or repugnant content; deal with sexual, health, or reproductive topics; or cover issues of concern to the lesbian, gay, bisexual and transgender communities.

Rejection of periodicals (e.g., magazines and newspapers) must be done on an issue-by-issue basis, rather than rejecting an entire subscription.

Inmates will be advised promptly in writing when a publication they have ordered has been rejected, and will be given 20 days within which to appeal the Warden's decision. The publisher/sender of the publication will also be given notice that it has been rejected and an opportunity to appeal the decision.

The Warden of your facility can set limits on how many publications inmates may retain in his or her quarters.

## You can review the complete policy on Incoming Publications in the Law Library.

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD BOYER, AMIR FATIR, and )
WARREN WYANT, )
 )
       Plaintiff, )
 )
     v. )     C.A. No. 06-694-GMS
 )
COMMISSIONER STANELY TAYLOR, et al., )    Jury Trial Requested
 )
     Defendants. )

## <u>AFFIDAVIT OF TONYA SMITH</u>

I, Tonya Smith, having been duly sworn by law, do hereby depose and state as follows:

1.    I am employed by the State of Delaware Department of Correction ("DOC") as a Support Services Manager at the Delaware Correctional Center ("DCC"), Smyrna, Delaware. I have been employed by DCC since 1993, and as a Support Services Manager for the past two years.

2.    Department of Correction Policy #4.5 governs the policy and procedures behind the handling and review of incoming publications for inmates. The purpose of the policy is to balance the promotion of education and literacy with the institution's responsibility to provide a safe and secure facility. DOC Policy 4.5 is patterned after the Federal Bureau of Prisons' policy on incoming publications.

3.    DOC Policy 4.5 states that an incoming publication may be rejected if it depicts, describes or contains sexually explicit material. Examples of sexually explicit material include, but are not limited to, sado-masochism, bestiality and material involving children.

1

4.      The ban on sexually explicit material is necessary for the safety and security of DCC. Inmates often trade, barter and sell sexually explicit materials to other inmates.   This conduct presents risks to institutional safety and security because the sexually explicit materials that are traded, bartered or sold could fall into the hands of sex offenders and rapists.   It is believed that sexually explicit depictions are contrary to the rehabilitation of sex offenders and rapists.   Moreover sexually explicit materials may contribute to other unacceptable and dangerous behaviors amongst the inmate population as a whole.

5.      Inmate Amir Fatir, SBI #00137010 requested the book "Shakti:   The Feminine Power of Yoga."   This book was rejected as it contained sexually explicit materials that violated Policy 4.5 and were considered to present a risk to the safety and security of the DCC.

_____
Tonya Smith

**SWORN AND SUBSCRIBED** before me this ___8th___ day of ___May___,
2008.

_____
Notary

2