IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

Boyer, et al., )
)
Plaintiffs, )
)
v. ) C.A. No. 06-694-GMS
)
Taylor, et al., )
)
Defendants. )

**PLAINTIFFS' REPLY TO STATE'S RESPONSE TO PLAINTIFFS' REQUEST FOR ENTRY OF DEFAULT**

The plaintiffs reply to State defendants' response as follows:

1. Since counsel for State defendants is of a relatively young age, to assist her in understanding the plaintiffs' claim, and to remove it from the domain of "nonsense," it will be necessary to provide a brief history of the commissary at the Delaware Correctional Center ("DCC").

2. The Delaware Correctional Center was constructed in the late 1960s and was first housed with inmates in 1971 when the Old Work House on Greenbank Road near Prices Corner was closed and inmates were transferred to the Delaware Correctional Center.

3. When the first inmates were transferred from the Old Work House to the Delaware correctional Center, the Inmate Commissary was also transferred. The original commissary account was set up as a trust fund at the Old Work House by the Greenbank Jaycees well before the construction of the DCC.

FILED
JUN - 6 2008
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
BO scanned

4. The DCC commissary account was originally governed by Department of Correction administrative regulation which provided for monthly account statements to be provided the inmate population who are beneficiaries of the account, and the policy limited profits and directed expenditures to be exclusively for inmate recreational activity and equipment.

5. Over the years with new administrators and Department of Justice attorneys like defendants' present inexperienced counsel, the history of the account has been forgotten, perhaps conveniently, and the account has consistently been converted into a gigantic cash cow by the Department and has bee n misused and abused.

6. In the 1980s, the account was audited by inmate Cecil Hall through the Freedom of Information Act, ending in the state being forced to return funds misused, and for a short time prison officials posted monthly statements, however, the account has continuously been handled inconsistently with its original nature and established policy.

7. It is for these precise reasons that plaintiffs have moved for receivership of the account for audit and correction of policy governing it, as well as to require the discontinuance of abuses. Because of the origin of the account being created with donated funds in trust for the benefit of the inmate population, the ignorance of State defendants' counsel of the history and character of the account is a clear indication of the extent of the problem.

8. In 1976 DCC was caught misusing the commissary account funds, spending the money that can only lawfully be spent for inmate recreation upon such things as guards' uniforms and mailroom equipment. DCC was forced to return the pilfered money back into the commissary trust account.

9. During the late 1980s and early 1990s when plaintiff Fatir was the editor of *The Isthmus* newspaper, monthly statements on account transactions and expenditures were published. Then Support Services Manager Elizabeth Burris told *The* Isthmus that the markup from the wholesale cost of items could only be marked up 20% and that big ticket items like TV's and radios would only be marked up 10%. Plaintiffs will provide a copy of such published articles should this court desire.

10. The regulations and rules that govern the commissary account are included in the Department of Correction's administrative regulations. Those regulations have the same force as statute since they are issued in accordance with the Department of Correction's enabling statute.

11. 11 Del. C. § 6531 (f) states "The Department shall establish programs of work, case work, counseling and psychotherapy, library and religious services and commissary, and shall further establish procedures for the classification of inmates for those purposes."

12. Ms. Erika Y. Tross' claim that "There is no 'Commissary Trust Fund Account' established for the benefit of the prisoners at DCC" is baffling in its ignorance of the well-established facts. Even so, her "ignorance of the law is no excuse" and she should have filed a response on behalf of her clients and cannot now lawfully hide under a disingenuous notion that since she declared the TRO request "nonsensical," she was free from her obligation of responding. At the very least she could have quite easily have sought clarification or, even more effective, she could have read the regulations that pertain to the inmate commissary trust fund account.

13. Prisoners are wards of the state and the state's outright robbery, misuse and misappropriation of the funds in the trust account are not only unconscionable, they are also criminal.

14. If the allegations in this case regarding the commissary account are true, nay, if they are even 10% true, this court has a moral and professional responsibility to notify the United States Justice Department and proffer criminal charges against those defendants and their co-conspirators who are responsible for the outright robbery of the monies which belong to the plaintiffs and prisoners in the Delaware Correctional Center.

15. Federal courts have previously addressed similar abuses of inmates' commissary trust fund accounts. ""The Commissary Fund, comprised of profits from the sale of 'articles' at the prison commissaries, is termed a 'trust fund' by the provisions of 31 U.S.C. § 1321(a)(22). Furthermore, 31 U.S.C. § 1321(b) provides that '[a]mounts accruing to [the Commissary Fund] … are appropriated to be disbursed in compliance with the terms of the trust.' Those trust terms are contained in Department of Justice circular 2244 entitled 'Rules Governing the Control of Prisoners['] Funds at the Several Penal and Correctional Institutions" (1932), and provide that '[w]ith approval of the Director, Bureau of Prisons, the 'Welfare Fund' may be disbursed on written order of the Warden for any purpose accruing to the benefit of the inmate body, as a whole, such as amusements, education, library, or general welfare work.' Circular 2244, ¶." *Washington v. Reno*, 35 F.3d 1093, 1101.

16. The inmate commissary fund at DCC is also a trust fund account and its profits must also be used for the benefit of prisoners, not for such "security" excesses as building a fence around buildings with the prisoners' money and, in true Orwellian

fashion, calling that fence a "recreation fence." It is high time for such nonsense, such outrageous abuses of power, to cease.

17. Usurpation of the inmate commissary account funds by state defendants violates the due process clause of the Fourteenth Amendment to the U.S. Constitution. "There is no question that an inmate's interest in the funds in his prison account is a protected property interest. *See Quick v. Jones*, 754 F.2d 1521 (9th Cir. 1984); *See e.g., Orloff v. Cleland*, 708 F.2d 372, 379 (9th Cir. 1983); *Hansen v. May*, 502 F.2d 728, 730 (9th Cir. 1974). Having determined that a protected interest exists, the only question left for the Court to decide is what process is due. This question is a question of law and therefore appropriately determined by summary judgment. *Belnap v. Change*, 707 f.2d 1100, 1102 (9th Cir. 1983), *cert. denied,* 464 U.S. 1009, 104 S.Ct. 528, 78 L.#d.2d 711 (1983)." *Scott v. Angelone*, 771 F. Supp. 1064, 1067.

18. "The Fifth Amendment declares that 'private property [shall not] be taken for public use, without just compensation.' U.S. Const. Amend. V; *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160, 101 S.Ct. 446, 450, 66 L.Ed.2d 358 (1980). That prohibition applies to the States through the Fourteenth Amendment. *Id.* ... Protected property interests are 'created and their dimensions are defined by existing rules or understandings that stem from an independent source, such as state law – rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Tellis v. Godinez*, 5 F.3d 1314, 1316. (9th Cir.).

19. "The earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property." *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 101 S.Ct. 446 at 452.

20. In *Washington v. Reno*, supra, as in the instant case, prison administrators used commissary account money for security purposes which "likely represents a breach of fiduciary duty under the trust." Like *Reno*, again, prison security performed by commissary fund finances – including purchases and salaries – directly violated statutory directives that such functions be funded by the U.S. Treasury. *Reno*, supra. Under Delaware law, security expenditures must be paid by the state treasury. "To the extent the fund is irreparably and illegally depleted for prison security and inmate control, the beneficiaries of the trust fund can show that a limited injunction should issue to deter such violations by the trustee." *Washington v. Reno*, supra at 1102.

21. Persons grieved by unlawful seizure of property are entitled to get it back. See Fed. R. Crim. P. 41(3). *Gonzalez v. U.S.* 257 F. 3d 31, 34.

22. Nor can a state change private property into public property ipse dixit, without just compensation. *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 101 S.Ct. 446 at 452.

*22.* The attorney for CMS jumped on the state's bandwagon even though the claims relating to the commissary fund have nothing to do with Correctional Medical Services. Had that attorney, Mr. James E. Drnec, read the complaint he would have seen that Count 32 clearly states that "Defendants Taylor, Howard, Carroll, Hosterman, Pierce and Havel are responsible for protecting the money from the commissary account which belongs to plaintiffs and the inmate population who are all wards of the state." Since Mr. Drnec doesn't represent either of those defendants, his statement that "As such, the relief requested by Plaintiff has no bearing on CMS and both motions should be denied" is, itself, nonsensical. Or, as James Brown once sang, "Don't start none, won't be none."

**WHEREFORE** plaintiffs move this court for default as originally sought as counsel for the State defendants have failed to exercise due diligence in investigating the claim as it is assuredly not "nonsense."

Respectfully submitted,

Amir Fatir # 137010

WARREN WYANT

Warren Wyant

# Certificate of Service

I, Amir Fatir, hereby certify that I have served a true and correct copy(ies) of the attached PLAINTIFFS' REPLY TO STATE'S RESPONSE

TO PLAINTIFFS' REQUEST FOR ENTRY OF DEFAULT

upon the following parties/persons:

To: Erika Tross
Depart of Justice
820 N. French St
Wilm., DE 19801

To: James Drnec, Esq.
Balick & Balick
711 King St.
Wilm. DE 19801

To:

To:

To:

To:

BY PLACING IN A SEALED ENVELOPE, and depositing same in the United States Mail at the Delaware Correction Center, Smyrna, DE 19977.

On this 2nd day of June, 2002

Amir Fatir
SBI # 137010

I/M Amir Fatir
SBI# 137010 UNIT W
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977




Clerk
U.S. District Court
844 King St., Lockbox 18
Wilmington, DE 19801

Legal
Mail

EXHIBIT A

## From the Director's Chair

by Ed Chase
(Lifers Program Director)

The February Edition of the Isthmus created a great deal of controversy. The controversy centers primarily around whether inmates and staff have the legitimate right to comment on departmental issues.

Some staff took exception with what was reported. That is exactly what I expected would happen. All informed individuals should know that controversy often creates a foundation for understanding: opinions are stated, ideas are shaped and reshaped and, one hopes, informed conclusions are acheived.

Within the Delaware Correctional Center this simple formula appears to have a very small following.

We have among us certain staff who seem to wish to ignore this formula and simply condemn. It's as if these individuals desired only to control and isolate and not grow.

This is a season when constructive change is in the air for this Department and this institution. We are on the threshold of change. Our processes are being evaluated and our responsibilities re-defined. Commissioner Watson and Bureau Chief Risley are looking at what we do and evaluating the ideas for change that will eliminate the stagnant, reactionary aspects of our course of former years. If the Isthmus can aid in this evolution by helping inmates and staff change the status quo in appropriate ways, then it will help all of us to ready ourselves for the things that must be done to make this a more effective prison.

Once again, there is a challenge here to all who make up this institution. Become involved in building positive bridges of communication. Involve yourself in the future of this Department.

To those staff and inmates who have been told they cannot involve themselves in this project, I submit that this reflects an approach which helped to create the problems which now so tightly bind us.

It is only natural that there occasionally arise disagreements with some of the articles we have published and will publish. This is healthy and will eventually lead to a constructive dialogue--WRITE TO THE PAPER and state your beliefs. We are not above altering out opinions. We certainly are not so arrogant as to think that different, honest thinking must be, or ever should



## Commissary Account Report

With information supplied by Ms. Elizabeth Burris the Isthmus is now able to bring you a regular report on the Commissary account. In addition to a regular statement of earnings, other areas that are affected by this account will be mentioned.

The selection of merchandise is determined by past experience. Ms. Burris tells us that in order to get new items 'petitions/requests for (the)items are submitted to the Support Services Officer.' Mr. John Walsh, the Support Services Officer, said that 'security, space, and housing regulations (cell limitations) have a bearing on what is allowed.' If the request gets by security, it must then pass three preliminary stages: First, a vendor must be available who carries the item. Second, if there isn't a reasonable substitute being sold, a new item will be selected that is affordable to the population. Finally, there must be room to store the additional inventory.

According to Mr. Walsh, 'All items are subjected to a 20% mark-up. Items such as TV/Radios are not marked-up the same percentage because of their high cost. These big ticket items are marked up 10 & 15%.' Ms. Burris notes that 'stamps and cigarettes are sold at cost ' This helps to explain why the gross margin percentage listed below is not higher.

| | | |
|---|---|---|
| SALES | $79,924.99 | |
| INTEREST | $266.24 | |
| MISCELLANEOUS | $14.76 | |
| GROSS RECEIPTS | | $80,205.99 |

*Continued on page 4*






*Continued from page 1* **New Jail**

County zoning laws only permit prisons to be built in "residential" zones. Therefore, the current prison site must be "rezoned" from one of manufacturing to one of residential before a prison can be built there.

The majority of South Wilmington's predominantly Black area residents surrounding the proposed site vehemently oppose the construction of the prison in their neighborhood. For these residents with a 'not in my backyard' attitude, this prison is a very hard pill to swallow. Some residents feel that the state is only getting away with locating the prison in their neighborhood because the neighborhood is Black.

"Blacks are tired of being dumped on," says one area resident.

Senator Herman Holloway Sr. believes that the prison should be built in the South Wilmington area. The Castle Administration views the purposed site as an asset which will help alleviate the overcrowding problem the state is facing. A recent study has shown that a large percentage of Delaware's incarcerated inmates are from the Wilmington area. The Dept. of Correction feels that a new prison in the Wilmington area will afford the inmates' families and loved ones easier access to the prison for the purposes of visitation.

The South Wilmington area is currently experiencing revitalization and economic growth. Nearly 30 new Townhouses are presently under construction. Homeowners and property owners fear that talk of building a prison in the area could adversely affect their property's value as well as the revitalization plans.

Area civic groups and residents are earnestly seeking their council members' aid in pressing the state to consider other locations on which to erect the new prison. One alternate site that's been mentioned is on the grounds of the Delaware State Hospital.

There are currently two major Correctional Facilities already located in Wilmington's Black communities. The Multi-Purpose Criminal Justice Facility on East 12th Street and the Plummer Center at 38 Todds Lane are both situated in predominantly black neighborhoods.

To date there is nothing to suggest that the new state prison will not be built in the South Wilmington Area.




*Continued from page 2* **Commissary**



| | | |
|---|---|---|
| 12/01/88 INVENTORY | $58,741.17 | |
| PURCHASES: | | |
| CASH | $27,706.42 | |
| ON ACCOUNT | $39,808.56 | |
| TOTAL GOODS AVAILABLE FOR SALE | | $126,256.15 |
| LESS 12/31/88 INVENTORY | | $51,474.29 |
| COST OF GOODS SOLD (COGS) | | $74,791.86 |
| GROSS RECEIPTS | | $80,205.99 |
| LESS COGS | | $74,781.86 |
| GROSS PROFIT (LOSS) | | $5,424.13 |
| % GROSS PROFIT | | 6.76% |
| LESS OPERATIONAL EXPENSES | | $250.00 |
| LESS FILM & REC. EXPENDITURES | | $4,487.32 |
| NET PROFIT (LOSS) | | $686.81 |

This means the overall balance in the commissary account went up by $686.81 in December. Ms. Burris has said that the cost of the T.V. antennae system is being deducted from the account. Until this project is finished, purchases for the gym and other areas must be decreased.

Input for the movie selection is channeled through the Recreation Dept. An inmate or group of inmates can send a list of movies they'd like to see to the Recreation Dept. Bruce Sheiker said that with the exception of those containing graphic sex or violence, most films can be shown here. This rule was handed down to the Recreation Dept. by the Dept. of Correction after complaints about "Blood Sucking Freaks," a movie shown at Gander Hill.

## 'Jail no joke,' Lifers tell PRC Class

Bukhari Mutee'

On February 23, 1989 an historic event took place between the Lifers' group and the Pre-Release Class. For the first time ever an inmate group was asked to participate in the PRC program. Mr. John Pridgen, the counselor for the PRC, has coordinated an unique approach that included the Lifers' group.

*Continued on page 6*

*Continued from page 12*

in our lives, especially the human love that may most powerfully and passionately reflect God's love? Shall we agonize over the obligation to win it, earn it, prove ourselves worthy of it, do penance because of our failure to be worthy of it - or shall we, like Walter 'Sweetness' Payton when presented with the pigskin by one of the painfully numerous Chicago Bear quarterbacks, take our love, and in the company of our beloved, run for daylight?'

---

## CORRECTIONAL PERSON OF THE MONTH
## Paul C. Worsham

'Prison' and 'punishment' are words so closely linked in our minds that most people make no distinction between the two.

According to Webster, however, prison is merely a place where persons are confined and this, too, would seem to be the view of C.O. Paul C. Worsham, better known as 'Mr. Worsham' among inmates who have bestowed upon him the title of 'Mr.' out of respect and in appreciation for his treating them like human beings.

Mr. Worsham, who will be 65 in August, works the 8-4 shift in S-1. He has a wife, Julia, from Liverpool, England, who he met while stationed in England with the Air Force. They have been married over 30 years and have a daughter, Colleen, and a grandson, Danny, and Mr. Worsham looks forward to taking Danny fishing and hunting when he is old enough.

Having come to work for the Department of Correction 17 years ago, Mr. Worsham explains, 'I had only two previous jobs, first with the Merchant Marine, then 23 years as a Tech Sergeant in the Air Force. After retiring from the Air Force I didn't want to work on base and I was looking for secure employment.'

While with the Merchant Marine he sailed to 91 different flag countries, also to the Virgin Islands, Puerto Rico, and places like Hawaii, which wasn't yet a state at that time. When asked to name some of these far-off exotic lands, the names began to roll off his tongue like a listing for the World Atlas - Japan, China, Korea, Germany, Spain, Portugal, Holland, Finland, and so on, until he finally said, 'You name it, I've been there,' and laughingly added that he had been in Thailand when it was still Siam. He is also a Vietnam Veteran, having served there for 13 months while he was with the Air Force.

Aside from his compassion for hunting as a recreational activity, Mr. Worsham preserves his status as a world traveller by going to England every year. 'This year I'll be leaving on October 12th and coming back on November 8th, then next year we're going to Sydney, Australia to visit my wife's sister,' he said.

Mr. Worsham is a man who takes pride in his work and finds pleasure in doing his job well. In a seemingly boring job, he says, 'It's never the same thing every day. Security takes precedence and is a correctional officer's main concern, but many people forget that inmate welfare takes second place,' and in his regard for the welfare of inmates, Mr. Worsham includes treating them with respect; going the extra yard to provide truly humane treatment, and allowing men to retain thier human dignity.

According to inmate Coy Bailey, 'We don't mind taking orders from Mr. Worsham. He never tells us to do things that don't make sense, and alot of the other officers could take lessons from him in this regard.' Mr. Bailey went on to state, 'I can't think of a time when Mr. Worsham wrote somebody up who didn't really have it coming and, even then, he will warn us first and give us a chance to correct the problem.'

Abdullah Karim, another inmate, says, 'He's fair and he's consistent, and I honestly don't know anybody who doesn't like him. Mr. Worsham's just a nice guy. I guess he can't help it.'

One is given cause to wonder at such high praise from inmates for their supposed natural enemy - a correctional officer. Mr. Worsham gives credit to the Administration for allowing him to exercise, to an extent, his own judgement in the performance of his duties. 'The present higher echelons here at DCC are some of the best I've ever had the privilege of working under,' states Mr. Worsham.

In summing-up the way inmates feel about Mr. Worsham, Ronald Wood states, 'When a judge removes a person from society, that alone is his punishment for whatever crimes he committed. Many guards believe it's their job to impose further punishments, or make life hard for inmates, and they do so every chance they get. We are thankful for guards who are wise enough to know where the duties of a correctional officer end, and guards like Mr. Worsham are few and far between.' Wood added only half jokingly, 'Maybe after reading this article, Mr. Worsham will abandon thoughts of retirement and re-enlist. If not, he is one officer who will be sadly missed.'

---

Commissary Account Statement

The following is a general statement of earnings for the first five months of 1989. The

*Continued on page 14*



*Continued from page 13*

Support Services Officer dispersed, on the average, $4,623.00 per month for film and recreation. The Isthmus is attempting to get a breakdown of these expenditures.

| | |
|---|---|
| Gross Receipts | $335,097.45 |
| Inventory Cost | 289,062.69 |
| Gross Profit | 46,034.76 |
| Operating Exp. | 1,683.91 |
| Rec. & Film | 23,115.85 ($4,623.13 per month) |
| Net Profit | 21,235.00 |

## Ending the rumors

**by Gary Anderson**

The purpose of this article is to once and for all lay rest to the persistent rumor that Counselor Ed Chaffee is related to the Kennedy clan of Hyannisport, Massachusetts.

Upon learning through reliable sources that Mr. Chaffee was born in Boston and raised in nearby Roxbury, and that further sources attesting to his maternal heritage were currently living in Greenville, Delaware, this reporter felt obliged to dig a little deeper.

Sources requesting anonymity have stated that Mr. Chaffee consciously concealed his heritage in the belief that this knowledge, if made public, would impede his ability to function as a counselor or social worker. Chaffee, a true Democrat and according to some accounts 'the last 'white hope' for oppressed minorities,' has chosen not to comment - for fear of adding smoke to the fire of unproven rumors.

Amir Fatir, editor of the Isthmus, when asked to comment stated, 'I wouldn't touch this one with a ten-foot pole,' leaving one to wonder at the political repurcussions that might result if certain facts were disclosed.

Left with only the facts of Mr. Chaffee's birthplace and acquaintances, we must come to the conclusion that the rumors are no more than idle gossip. Hopefully, the future will provide the proper political atmosphere for Mr. Chaffee to 'come out of the closet,' if indeed that is his current place of residence.

## Little Joe

**by Glenn S. Dudley**

This article focuses primarily on one inmate, Joseph F. Dickerson, better known to many as "Little Joe."

I had the opportunity to sit down with Joe and go beyond the surface of the mask he hides behind. In there I found a man who wants and needs attention; not the type of attention - psychotropic medication - he's been receiving for the past eleven years, but rather the sense that he is cared about, encouraged, and not looked down upon as being "throwed off." Perhaps Joe's need is not the medication he receives because he's been told he's unbalanced, but a sense of worth. This could be easily instilled with a minimum of effort.

The results of Joe's medication, I'm told from a professional source who did not wish to be named in this article, have proved to have many serious and damaging effects that leave lifelong scars.

Little Joe has been in the system since the spring of 1979, originally sentenced to sixteen years. He now has twenty-four years. The additional eight came as a result of setting fires in the institution. Joe was sent to the Delaware State Hospital in 1984 for a period of one year and began taking the medication he is taking now. He was sent back because he was told that he was mentally capable to return.

Joe says, 'When so many people tell you you're crazy or unbalanced, you start to wonder.' He says, 'Just because I walk around with my coffee cup and sing, people think I'm crazy.'

One employee of the Department of Corrections, Lt. Heverin, says that he has known Joe for some time now and that Joe's need goes beyond just giving him drugs to control him. He then went on to say that he feels sorry for Joe for the way he is not getting the proper treatment.

I sat down with Joe and gave him the feeling that he is somebody, and it was just a few days after our discussion that I noticed that Joe had trimmed his hair and shaved. Although he still carried his cup, he proved to me that he and others like him really need to be given the feeling of being worth something. Perhaps this need should be reinforced daily, not with drugs, but with a little heart. Or do we need to ask Jesse Jackson to fly here and lead the many inmate victims of psychological violence in a chant of 'I am somebody'?

Don't grumble because you don't have what you want; rather, be thankful you don't get what you deserve.