IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DONALD BOYER, AMIR FATIR, and )
WARREN WYANT, )
)
      Plaintiffs, )
)    C.A. No. 06-694-GMS
   v. )
)    Jury Trial Requested
COMMISSIONER STANELY TAYLOR, et al., )
)
      Defendants. )

## STATE DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR A PRELIMINARY INJUNCTION TO PROHIBIT RESTRICTION TO TWO BOOKS [RE: D.I. 136]

COMES NOW, State Defendants Thomas Carroll, Ronald Hosterman, David Pierce, Jeanette Havel, Janice Henry, Michael Little, Floyd Dixon, Marvin Creasy, James Satterfield, Maureen Whelan, Ralph Bailey, and David Hall (the "State Defendants"), by and through their undersigned counsel, and hereby respond in opposition (the "Response") to Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction to Prohibit Restriction to Two Books (the "Motion to Prohibit Restriction") (D.I. 136). State Defendants assert that the Court should deny Plaintiffs' Motion because the Motion is moot as Plaintiff Fatir has received the books he claims were withheld and because Plaintiffs cannot show that they are likely to succeed on the merits of their claim or that they will suffer irreparable injury if the Motion is denied. In support of the Response, State Defendants state as follows:

    1.     Plaintiffs Donald Boyer, Amir Fatir, and Warren Wyant (the "Plaintiffs") are all inmates presently incarcerated at the Delaware Correctional Center ("DCC") in

Smyrna, Delaware.  Plaintiffs are appearing *pro se* in this matter with leave to proceed *in forma pauperis*.

2.        On November 15, 2006, Plaintiffs, along with nine (9) other individuals who have since been dismissed from the case, filed a Complaint against 25 Defendants alleging various claims.  (D.I. 10).

3.        Less than two months later, on January 5, 2007, Plaintiff Boyer filed the First Amended Complaint against all of the defendants adding new claims and allegations.  (D.I. 18).  On July 30, 2007, Plaintiffs filed a Second Amended Complaint further refining their allegations and claims against the defendants.  (D.I. 43).  The Court entered an order reviewing and screening the Second Amended Complaint on January 14, 2008.  (D.I. 65).  Following the review, 20 counts of Plaintiffs' Complaints remained against the State Defendants.  On March 20, 2008, the State Defendants filed an Answer to the remaining claims.  (D.I. 104).

4.        Following the filing of their Second Amended Complaint, the Plaintiffs, led by Plaintiff Fatir, filed a series of five motions requesting injunctive relief for various issues.  State Defendants filed a response in opposition to each of the five motions.  The Court denied all five of the Plaintiffs' motions in an order dated March 28, 2008.  (D.I. 112).

5.        Less than one month following the Court's decision, on April 21, 2008, the Plaintiffs, again led by Plaintiff Fatir, filed another motion for injunctive relief claiming that Fatir was being denied the right to receive certain books (the "Motion to Receive Books") (D.I. 118).  In the Motion to Receive Books, Plaintiff Fatir claimed that this Court should grant him injunctive relief because the DCC has "prevented [him] from

receiving the following publications: *The Catcher in the Rye*, *Natural Cures They Don't Want You to Know About*, *Ishmael*, *The Multi-Orgasmic Woman* and *Shakti: the Feminine Power of Yoga*." (D.I. 112 at ¶ 1). The State Defendants filed a response in opposition to the Motion to Receive Books on May 8, 2008. (D.I. 125). The Court has not yet ruled on the Motion to Receive Books.

6.       On June 23, 2008, Fatir filed the Motion to Prohibit Restriction. (D.I. 136). In the Motion to Prohibit Restriction Fatir claims the Court should grant him injunctive relief because the DCC withheld from him the book *Understanding the Black Woman* – one of three books sent to him by Khabooks.com. Plaintiff Fatir further asserts that the actions of the Defendants are "draconian and serve no legitimate penological interest other than to keep prisoners ignorant and incapable of legally challenging their mistreatment at the hands of their jailers." (Motion to Prohibit Restriction at ¶ 7).

7.       Four days after the motion was filed, on June 27, 2008, personnel at DCC realized that there was an error in the mailroom regarding the prohibited mail notice sent to Fatir for his third book. As a result Fatir was issued his third book. (Exhibit A). Fatir signed for receipt of this third book – *Understanding the Black Woman* – on June 27, 2008. (*Id.*).

I.       **Fatir's Claims Are Moot Now That He Has Received His Book.**

8.       This Court should deny Plaintiffs' request for injunctive relief because the issue is now moot. "'[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome.'" *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) (internal citations omitted). A court should not render a decision on the merits of a claim that is moot because "it becomes impossible for the

court to grant 'any effectual relief whatever' to [the] prevailing party." *Id.* (internal citations omitted).

9.     In the Motion to Prohibit Restriction Plaintiffs claim that Fatir has been unjustly denied the book *Understanding the Black Woman* which was sent to him by Khabooks.com.  A misunderstanding occurred in the mailroom at DCC which resulted in Fatir being denied the third book.  After the error was corrected the mailroom notified Fatir that he was entitled to receive the third book.  On June 27, 2008, Fatir received the book *Understanding the Black Woman*.  (Exhibit A).  Therefore Fatir no longer has a live issue and his request for injunctive relief is moot.

## II.    Plaintiffs' Request For Injunctive Relief Should Be Denied Because They Cannot Satisfy The Factors For Injunctive Relief.

10.     Assuming, *arguendo*, that Fatir's claim is not moot, this Court should still deny the Plaintiffs' Motion because they cannot satisfy the factors for injunctive relief.  A grant of injunctive relief is an extraordinary remedy.  Thus a request for injunctive relief should only be granted in limited circumstances.  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989).

11.     The Third Circuit holds that a district court should grant a request for a preliminary injunction only if "(1) the plaintiff is likely to succeed on the merits; (2) denial will result in irreparable harm to the plaintiff; (3) granting the injunction will not result in irreparable harm to the defendant; and (4) granting the injunction is in the public interest." *Maldonado v. Houstoun*, 157 F.3d 179, 184 (3d Cir. 1998).  An injunction should only issue if all four factors favor relief.  *See S & R Corporation v. Jiffy Lube International, Inc.*, 968 F.2d 371, 374 (3d Cir. 1992).

12.    To obtain a preliminary injunction Plaintiffs must satisfy all four factors. If they cannot prove that they have a likelihood of success on the merits of their claim or that they are likely to suffer irreparable injury, the request for preliminary injunction should be denied.  *See Instant Air*, 882 F.2d at 800.

13.    State Defendants assert that the DCC's policy regarding the limitation on the number of books an inmate is allowed in his cell does not violate the Plaintiffs' First Amendment rights.  Therefore the Plaintiffs are not likely to succeed on the merits of their claims.  Moreover, the Plaintiffs will not suffer irreparable injury if they are not immediately granted the ability to receive more than three books in their cell.  For these reasons the Court should deny the Plaintiffs' Motion.

A.    **Plaintiffs cannot succeed on the merits of their claim because the three book rule satisfies the *Turner* test and does not violate their constitutional rights.**

14.    The first factor of the preliminary injunction test requires that the moving party show that he is likely to succeed on the merits of his claims.  *Maldonado*, 157 F.3d at 184.  To establish a valid claim under § 1983, a plaintiff must demonstrate that the defendants, while acting under color of state law, deprived him of a right secured by the Constitution or the laws of the United States.  *Moore v. Tartler,* 986 F.2d 682, 685 (3d Cir. 1993).

15.    "'[C]onvicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison.'"  *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (quoting *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).  Included in the rights prisoners retain are the protections of the First Amendment.  *Id.*  But "'[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and

rights, a retraction justified by the considerations underlying our penal system.'"  *Id.*

(quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948)).  Thus the Supreme Court has held

that, "'when a prison regulation impinges on inmates' constitutional rights, the regulation

is valid if it is reasonably related to legitimate penological interests.'"  *Williams v.*

*Morton*, 343 F.3d 212, 216 (3d Cir. 2003) (quoting *Turner v. Safley*, 482 U.S. 78, 89

(1987)).

     16.     To determine if a prison regulation is reasonably related to a legitimate

penological interest a court must weigh four factors:

> (1) whether there is a valid, rational connection between the
> prison regulation and a neutral and legitimate government
> interest; (2) whether there are alternative means of
> exercising the right in question; (3) the impact that
> accommodation of the asserted constitutional right would
> have on guards and other inmates; and (4) whether there are
> adequate alternatives to meet the prison's objectives.

*Jolly v. Snyder*, 2003 WL 1697539, at *2 (D. Del. March 22, 2003) (citing *Turner*, 482

U.S. at 89-91) (Exhibit B).

     17.     DCC Housing Rules state that an inmate is allowed to have in his cell,

"Two personal or library magazines, three library or personal reading books (which may

include Bible and/or Koran), and one newspaper that does not promote illegal activity."

(Exhibit C at 7, ¶ 6b).  The DCC has been advised by the Delaware State Fire Marshal to

limit combustibles in the cells of inmates to protect the safety of the institution.  (Exhibit

D – "Hosterman Affidavit" at ¶ 3).  Thus, the purpose of the limitation on the number of

books and magazines within the cell is to prevent a fire and safety hazard and to protect

the well being of the inmates housed within the institution.  (*Id.*).

18.    Clearly the first factor of the *Turner* test has been met – the DCC rule limiting the number of books is related to the neutral and legitimate interest of preventing a fire and safety hazard to the institution and the inmates housed therein.

19.    The second *Turner* factor is also satisfied.  Although the Plaintiffs are limited to a certain number of items in their cell they are allowed to have up to two magazines, three books and one newspaper.  (Exhibit C).  Moreover, the DCC library has over 7,000 books in circulation.  (Exhibit E).  Therefore, when Fatir is finished reading the three books currently in his cell, he is free to donate the books to the library or send them out and either check out new books or have new books mailed to him.  (Hosterman Affidavit at ¶ 4).  Therefore the Plaintiffs have a means of exercising their First Amendment rights.

20.    Permitting inmates like Fatir to have more than the requisite number of books could lead to other inmates also requesting an unlimited number of books.  This would then lead to the fire and safety hazard that the Fire Marshal has warned DCC against.  Thus the third factor of the *Turner* test is satisfied.

21.    Finally, in considering the fourth *Turner* factor, the Court must determine whether the plaintiff has proven "that an adequate alternative of reaching the prison's objective exists."  *Snyder*, 2003 WL 1697539 at *5.  In this case the Plaintiffs have not offered a single adequate alternative to the policy stating that inmates are limited to three books in their cell.  Given that the Plaintiffs have not offered any adequate alternatives, the final *Turner* factor is met.

22.    The policy used to restrict inmates to three books satisfies the *Turner* test and does not violate the Plaintiffs' First Amendment rights.  Therefore Plaintiffs are not

likely to succeed on the merits of their claim and the Motion to Prohibit Restriction should be denied.

**II.    Plaintiffs Cannot Prove They Will Suffer Future Irreparable Harm If Their Ability To Receive More Than Three Books Is Denied.**

23.    Aside from not satisfying the first factor for injunctive relief, Plaintiffs also cannot show that they will suffer irreparable injury if the Motion is denied.  To demonstrate irreparable injury a plaintiff must prove "more than a *risk* of irreparable harm …."  *Continental Group, Inc. v. Amoco Chemicals Corp*., 614 F.2d 351, 359 (3d Cir. 1980) (emphasis added).  Injunctions are not issued to eliminate a possibility of a remote future injury.  *Id.*  Rather, an injunction is used where the movant has shown that he "is in danger of suffering irreparable harm at the time the preliminary injunction is to be issued."  *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1264 (3d Cir. 1985).  Moreover, injunctive relief is used to prevent definite future harms, not to remedy past violations.  *See SEC v. Bonastia*, 614 F.2d 908, 912 (3d Cir. 1980).

24.    Plaintiffs cannot show that they are in danger of suffering irreparable harm if they are denied the ability to receive more than three books in their cell at one time.  As previously demonstrated, the Plaintiffs are permitted to have two magazines, three books and one newspaper in their cell.  Moreover, when they have finished the three books they have the opportunity to donate the books to the library and check out one of the more than 7,000 books the DCC has in circulation.  Therefore Plaintiffs are being given the opportunity to read and will not suffer irreparable injury if they cannot have more than three books in their cell at one time.

25.    Further, any irreparable harm Fatir claims he will suffer has been eradicated now that he has received his third book.

WHEREFORE, State Defendants respectfully request that this Honorable Court enter an Order, substantially in the form attached hereto, dismissing Plaintiffs' Motion to Prohibit Restriction.

**STATE OF DELAWARE
DEPARTMENT OF JUSTICE**

*/s/ Erika Y. Tross*
Erika Y. Tross (#4506)
Deputy Attorney General
820 North French Street, 6th Floor
Wilmington, Delaware 19801
(302) 577-8400
     Attorney for State Defendants

Dated: July 8, 2008

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| DONALD BOYER, AMIR FATIR, and WARREN WYANT, | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 06-694-GMS |
| v. | ) ) | Jury Trial Requested |
| COMMISSIONER STANELY TAYLOR, et al., | ) ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Upon Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction to Prohibit Restriction to Two Books (D.I. 136) (the "Motion"); and State Defendants' Response in Opposition to the Motion; and it appearing that good and sufficient notice of the Plaintiffs' Motion and the State Defendants' Response in Opposition has been given; and after due deliberation thereon:

**IT IS HEREBY ORDERED** that the Motion is **DENIED.**

SO ORDERED this _____ day of _____, 2008.

_____
The Honorable Gregory M. Sleet
United States District Court Chief Judge

## CERTIFICATE OF SERVICE

I, Erika Y. Tross, Esq., hereby certify that on July 8, 2008, I caused a true and correct copy of the attached *State Defendants' Response in Opposition to Plaintiffs' Motion for a Temporary Restraining Order and/or a Preliminary Injunction to Prohibit Restriction to Two Books [Re:  D.I. 136]* to be served on the following individuals in the form and manner indicated:

**NAME AND ADDRESS OF RECIPIENT(S):**

**Via First Class Mail**

Donald Boyer
SBI # 082420
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

Warren Wyant
SBI # 00176129
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

Amir Fatir
SBI # 137010
Delaware Correctional Center
1181 Paddock Road
Smyrna, DE 19977

**Via Electronic Delivery**

James E. Drnec, Esq.
Balick & Balick, LLC
711 King Street
Wilmington, DE 19801

*/s/ Erika Y. Tross*
Erika Y. Tross (#4506)
Deputy Attorney General
Delaware Department of Justice
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
302-577-8400

# EXHIBIT A

F18

## Items Received Through the Mail

Inmate Name (Print): _AMIR FATIR_    SBI#: _137010_ Unit: _W_ Date: _6-27-08_

Received via: [ ] U.S. Postal Service    [ ] UPS    [ ] Other

Sender: _____    Store of Purchase: _____

PO Box/Street: _____    PO Box/Street: _____

City, St, Zip: _____    City, St, Zip: _____

| Qty Rec'd | Qty Appr | Item | Description (color, size, title, ect) | Receipt Cost |
|---|---|---|---|---|
| 1 | 1 | Book/Periodical | BLACKMAN'S GUIDE TO UNDERSTANDING THE BLACK WOMAN | |
| ___ | ___ | Religious Book | _____ | ___ |
| ___ | ___ | Photographs | _____ | ___ |
| ___ | ___ | Wedding Band | _____ | ___ |
| ___ | ___ | Other | _____ | ___ |

_____    _6-27-08_
Mailroom Officer        Date

The Property Room Officer has received this form, with approved quantities being noted above.

_____    _____
Property Room Officer        Date

Items were given to housing unit Officer for distribution with white and yellow copies to be returned to Mailroom after inmate has signed and the pink to be given to the inmate.

_____    _27 Jun 08_
Staff Signature        Date

I have received the above-approved items. I request that the items not approved be sent to the following address at my expense. I have included a pay-to for postage with my response. If I do not include a pay-to or give any other instructions as to the disposal of above-disapproved property, within 5 days of receipt of this notice, the Mailroom will dispose of it.

Name: _____    _6/27/08_
Inmate Signature        Date

Street: _____

City, State Zip _____

White Copy – Property Officer
Yellow - Mailroom
Pink – Inmate

FORM# 677 (3-part) (Rev 09/02)

F-18

## Items Received Through the Mail

Inmate Name (Print): AMIR FATIR   SBI#: 137010   Unit: W   Date: 6-14-08

Received via: [ ] U.S. Postal Service   [ ] UPS   [ ] Other

Sender: _____   Store of Purchase: KHABOOKS.COM

PO Box/Street: _____   PO Box/Street: _____

City, St, Zip: _____   City, St, Zip: DREWRYVILLE, VA

| Qty Rec'd | Qty Appr | Item | Description (color, size, title, ect) | Receipt Cost |
|---|---|---|---|---|
| 3 | 2 | Book/Periodical | N'COBRA MEDITATIONS + PRAYERS | |
| | | Religious Book | | |
| | | Photographs | | |
| | | Wedding Band | | |
| | | Other | | |

1 BOOK TOO MANY UNDERSTANDING THE BLACK WOMAN

_____   MS   _____   6-14-08
                   Mailroom Officer          Date

The Property Room Officer has received this form, with approved quantities being noted above.

_____   _____
Property Room Officer   Date

Items were given to housing unit Officer for distribution with white and yellow copies to be returned to Mailroom after inmate has signed and the pink to be given to the inmate.

_____   6-14-08
Staff Signature   Date

I have received the above-approved items. I request that the items not approved be sent to the following address at my expense. I have included a pay-to for postage with my response. If I do not include a pay-to or give any other instructions as to the disposal of above-disapproved property, within 5 days of receipt of this notice, the Mailroom will dispose of it.

Name: _____   X _____   6/14/08
                         Inmate Signature      Date

Street: _____

City, State Zip _____

White Copy – Property Officer
Yellow - Mailroom
Pink – Inmate

FORM# 677 (3-part) (Rev 09/02)

BOOK SENT TO INMATE PER C. POWELL SSO

# EXHIBIT B

Westlaw.

Not Reported in F.Supp.2d                                                                                                    Page 1
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)**

**C**Jolly v. Snyder
D.Del.,2003.
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Allen JOLLY, Mark Kirk, Vincent Warren, Thomas
Manger, Juan Garcia, and John Schmitz, Plaintiffs,
v.
Robert SNYDER, Stan Taylor, Elizabeth Burriss,
Larry McGuigan, Francene Kobus, Ron Hosterman,
and Thomas Carroll, Defendants.
**No. C.A. 00-041-JJF.**

March 22, 2003.

Allen Jolly, Mark Kirk, Vincent Warren, Thomas
Manger, Juan Garcia and John Schmitz, pro se
Plaintiffs.
Stuart B. Drowos, Deputy Attorney General,
Delaware Department of Justice, Wilmington,
Delaware, for Defendants.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Pending before the Court is Defendants' Motion to
Dismiss (D.I.35). For the reasons discussed below,
Defendants' Motion to Dismiss will be granted.

BACKGROUND

1. *Facts*

This is a civil rights case filed by Plaintiffs, **inmates**
at the Delaware Correctional Center ("DCC"),
against Defendants, Department of Corrections
("DOC") employees. *See* Complaint, D.I. 2. Plaintiffs
seek compensatory and punitive damages for a prison
policy that allegedly denies Plaintiffs their **First
Amendment** right of free expression and Fourteenth
Amendment right of due process. *See* Complaint, D.I.
2 at 3a; Motion to Supplement Complaint, D.I. 12.
The prison policy in question forbids **prisoners** from
receiving through the mail any materials that exhibit,
either through photographic or written representation,
sexually explicit acts or nudity (the "policy").*See*
Defendants' Memorandum of Points and Authorities
in Support of their Motion to Dismiss, D.I. 36,

Exhibit A4. There is an exception in the policy for
material containing nudity "illustrative of medical,
educational, and anthropological content and material
of a news information type."*Seeid.*Plaintiffs complain
that (1) their right to free expression under the **First
Amendment** has been violated; (2) the policy is
overbroad because it **prohibits** receipt of **materials**
that do not contain **sexually explicit** representations;
and (3) that they are not notified of the rejection of
magazines or other **materials** and do not have an
opportunity to appeal rejection decisions, thereby
violating the Plaintiffs' right to due process under the
Fourteenth Amendment. *See* Complaint, D.I. 2 at 3a;
Motion to Supplement Complaint, D.I. 9 at 1-2;
Motion to Supplement Complaint, D.I. 12.
Defendants move to dismiss the Complaint for failure
to state a claim under Federal Rule of Civil Procedure
12(b)(6).

2. *Legal Standard*

The instant Motion to Dismiss is brought under Rule
12(b)(6) of the Federal Rules of Civil Procedure. The
purpose of a motion to dismiss pursuant to Rule
12(b)(6) is to test the legal sufficiency of a complaint.
*Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Strum
v. Clark,* 835 F.2d 1009, 1011 (3d Cir.1987). In
reviewing a motion to dismiss for failure to state a
claim, "all allegations in the complaint and all
reasonable inferences that can be drawn therefrom
must be accepted as true and viewed in the light most
favorable to the non-moving party."*Strum, 835 F.2d
at 1011;see alsoJordan v. Fox, Rothschild, O'Brien &
Frankel,* 20 F.3d 1250, 1261 (3d Cir.1994). This is
especially true when the complaint is made
*prose.SeeEstelle v. Gamble,* 429 U.S. 97, 106 (1976).
A court may dismiss a complaint for failure to state a
claim only if it is clear that no relief could be granted
under any set of facts that could be proved consistent
with the allegations. *Hishon v. King & Spalding,* 467
U.S. 69, 73 (1984); *Jordan,* 20 F.3d at 1261.

DISCUSSION

1. *Contentions*

*2 By their motion, Defendants contend that the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)

Page 2

Complaint should be dismissed for a number of reasons. First, Defendants contend that Plaintiffs' **First Amendment** claim should be dismissed because Defendants' policy is reasonably related to a legitimate and neutral penological interest and thus complies with *Turner v. Safley,* 482 U.S. 78 (1987). Second, Defendants contend that Plaintiffs' Due Process claim should be dismissed because Defendants have provided adequate safeguards by providing notice of confiscation of publications and by affording an opportunity to appeal such decisions. Additionally, Defendants assert various immunity defenses: (1) Defendants cannot be sued in their official capacities under the doctrine of sovereign immunity and the Eleventh Amendment; and (2) Defendants cannot be sued in their individual capacities under the doctrine of qualified immunity unless Plaintiffs can show that Defendants should have been aware that their actions violated clearly established constitutional rights. Finally, Defendants contend that the Section 1983 claim is invalid because (1) State officials acting in their official capacities are not "persons" for the purpose of Section 1983 claims and therefore are not subject to liability under it; (2) the doctrine of *respondeat superior* is not available in Section 1983 claims and therefore Plaintiffs have no claim against Defendants in their supervisory capacities unless they can show that Defendants acted with deliberate indifference and that their actions were causally related to the injury; and (3) Plaintiffs have failed to show personal involvement or knowing acquiescence of the alleged constitutional deprivation and negligence alone is not a cognizable claim under Section 1983.[FN1]

> FN1. Although Plaintiffs have not asserted a pendent state claim, Defendants in their Memorandum in Support of their Motion to Dismiss (D.I.36, ¶ 17) contend that this would also fail because the State Tort Claims Act, 10 *Del. C.* § 4001(3), shields Defendants from personal liability for acts done in good faith and without gross or wanton negligence arising out of the performance of their official discretionary duties.

Plaintiffs respond that (1) the *Turner v. Safley* requirements are not met because Defendants have failed to show that the policy is reasonably related to a legitimate penological interest; (2) the policy is overbroad as written and in its application, resulting in confiscation of materials that are not sexually explicit and resulting in the receipt of these publications by some **inmates** and not by others; and (3) the procedural safeguards that are in place do not provide adequate notice or an opportunity to be heard. Finally, in response to the immunity defenses, Plaintiffs argue that (1) the Eleventh Amendment does not bar law suits against Defendants in their individual capacities under Section 1983; and (2) the qualified immunity defense is unavailable as Defendants should have been aware that they were violating Plaintiffs' right to due process under the Fourteenth Amendment and to free expression under the **First Amendment.**

### 2. *First Amendment Claim*

Plaintiffs' **First Amendment** claim asserts that Defendants' policy of excluding certain materials from the prison does not meet the "reasonably related to legitimate penological interests" test of *Turner v. Safley,* 482 U.S. 78 (1987). To determine whether a prison regulation is "reasonably related to legitimate penological objectives," courts weigh four factors: (1) whether there is a valid, rational connection between the prison regulation and a neutral and legitimate government interest; (2) whether there are alternative means of exercising the right in question; (3) the impact that accommodation of the asserted constitutional right would have on guards and other **inmates;** and (4) whether there are adequate alternatives to meet the prison's objectives. *See id.* at 89-91.In *Turner,* the Supreme Court upheld a policy prohibiting **inmate** to **inmate** correspondence unless those **inmates** were family members or were corresponding concerning legal matters. *See id .* at 81-82.In so holding, the Supreme Court took notice of two important principles. First, that federal courts should consider valid constitutional claims of prison **inmates,** and second, that courts should accord substantial deference to administrators who are in a better position to deal with the problems of prison administration. *See id.* at 84-85.

### A. Valid, Rational Connection

**\*3** Defendants argue that the policy is necessary to maintain prison security and to further rehabilitative goals. Specifically, Defendants urge that possession of pornographic materials by **prisoners,** especially

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)

Page 3

sex offenders, can lead to sexual harassment of female officers and can undermine the safety of both prison guards and other **inmates**. Courts have held that these security and rehabilitation concerns are legitimate penological interests. See*Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989); *Turner*, 482 U.S. at 91-92;*Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir.1999). Accordingly, in the instant case, the Court concludes that the security and rehabilitative goals advanced by Defendants are legitimate penological interests.

The interest must also be neutral. See*Turner*, 482 U.S. at 89-90. Neutrality in the *Turner* context differs in meaning from the content-neutral requirement of the **First Amendment**. See*Amatel v. Reno*, 156 F.3d 192, 196 (D.C.Cir.1998). Neutrality in the *Turner* context means that the purpose of limiting access to certain material is not the suppression of expression but some other legitimate purpose. See*id.*In the instant case, censorship of materials containing sexually explicit content is certainly not content-neutral in a **First Amendment** sense; however, the Court concludes it appears neutral and for the legitimate purpose of security and rehabilitation.

Plaintiffs argue that the policy cannot be legitimate as there is no evidence that incidents of sexual harassment directed toward female prison guards have occurred at the prison. Nevertheless, a prison policy, such as the one in the instant case, need not be made following a determination that possible risks associated with the prohibited materials have already come to fruition, or even that such risks are likely to happen. Rather, an administrator of penal institution need only ascertain that admitting the materials would create an "intolerable risk of disorder" in the prison. See*Thornburgh*, 490 U.S. at 416;*Mauro*, 188 F.3d at 1060. In the Court's view, Defendants are in a better position to ascertain whether the materials at issue in the instant case create an intolerable risk of disorder, and thus, the Court finds Plaintiffs' argument unpersuasive.

Plaintiffs also argue that the prison policy is overbroad because it excludes more material than needed to adequately meet the prison objectives.[FN2]Plaintiffs argue that magazines, such as issues of *Maxim* and *Stuff*, that do not contain sexually explicit material or nudity have been excluded for some **prisoners** but allowed for others.

Courts have held that the discretion necessarily afforded prison administrators may result in inconsistencies in the application of a policy due to the variability within an institution, and therefore such inconsistencies alone are not necessarily signs of arbitrariness or irrationality. See*Thornburgh*, 490 U.S. at 417 n. 15. Also, the Court notes that true consistency could be obtained only through a more restrictive policy that would exclude publications by title rather than on a case-by-case basis. See*id.*Further, it may be that a broader exclusion would fail the "alternative means" prong of the *Turner* test and be vulnerable to an overbreadth attack. See*id.*

> FN2. Overbreadth analysis occurs under both the first and fourth prongs of the *Turner* test. Under the first prong, an overbreadth argument is used to cast doubt upon the purported legitimate interest at stake. Thus, a policy that excludes material far beyond what is needed to further the purported goals may belie the true, perhaps non-legitimate, policy. Under the fourth prong, overbreadth arguments are used to show that there are alternative means to combat the legitimate goals. Thus, if the policy operates to exclude materials beyond which the policy was meant to exclude, this may be evidence that the policy was not written narrowly enough and that there are alternative means to reach the same goal.

*4 Plaintiffs also argue that *Aiello v. Litscher*, 104 F.Supp.2d 1068 (W.D.Wis.2000), in which a policy restricting sexually explicit material and material containing nudity was struck down, supports their overbreadth argument. The policy in *Aiello* failed because it was so broad that materials such as a representation of Michelangelo's Sistine Chapel were excluded. See*id.* at 1079.The court concluded that a policy that led to exclusion of works of art and literature could not possibly be related to security and rehabilitation interests. See*id.* at 1080.In the instant case, there is no such allegation that works of art have been excluded. Rather, the prison policy at issue exempts from exclusion any materials that, despite containing sexually explicit content or nudity, have some independent scientific, artistic or anthropological worth. Therefore, the Court concludes that the *Aiello* decision is inapposite to the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)**

instant case. For these reasons, and because policies very similar to the one at issue have been found to have a valid, rational connection to a legitimate government interest, the Court concludes that the policy satisfies the first prong of the *Turner* test. See*Thornburgh,* 490 U.S. at 404;*Mauro,* 188 F.3d at 1058;*Amatel,* 156 F.3d at 201;*Smith v. Donohue,* 1992 U.S.App. LEXIS 25066 (7th Cir.1982); *Trapnell v. Riggsby,* 622 F.2d 290 (7th Cir.1980).

### B. Alternatives for Exercising Right

The second prong of the *Turner* test is whether the **prisoners** have alternative means of expression. See*Turner,* 482 U.S. at 92. Whether there are other means of expression should be viewed "sensibly and expansively." See*Thornburgh,* 490 U.S. at 417. In *Turner,* the Court did not require that the **prisoners** be afforded other means of communicating with **prisoners**, but that they be afforded the means of communicating in general beyond the narrow prohibition. *Turner,* 482 U.S. at 92. In the instant case, the question is not whether the **prisoners** have other opportunities to read pornographic materials, but whether they have the opportunity to read in general. Plaintiffs have not complained that they are denied all opportunities to read other materials. Therefore, the Court concludes that the policy satisfies the second prong of the *Turner* test.

### C. Impact

In analyzing the impact that accommodation of the right would have on third parties such as prison guards and other **inmates**, courts must consider possible "ripple effect[s]." *Turner,* 482 U.S. at 92. In the prison context, it may be impossible to exclude materials based, for example, on whether the **prisoner** is a sex offender or not because the ease of passing materials from one **prisoner** to another makes segregation of these materials impossible. In the instant case, Defendants point out that, although sex offenders are housed separately, sex offenders integrate with the general prison population during meals, exercise, library hours and other recreational activities. Authorizing receipt of materials by some **prisoners** yet prohibiting receipt by others on an individualized basis would not solve the "ripple effect" problem and would come at the high cost of significantly less liberty and safety for prison guards and other **prisoners**. See*id.*Therefore, the Court

concludes that the policy satisfies the third prong of the *Turner* test.

### D. Alternative Means

**\*5** Plaintiffs have the burden of proving that an adequate alternative of reaching the prison's objective exists. See*Mauro,* 188 F.3d at 1062. The prison need not have adopted the least restrictive alternative to achieve its objective. See*Turner,* 482 U.S. at 90, 93 n.\*. Plaintiffs claim that the policy excludes certain magazines, such as *Stuff* and *Maxim,* which do not contain sexually explicit materials or nudity. However, in *Amatel,* the court noted that overbreadth claims on the "margin of pornography" have faired poorly. See*Amatel,* 156 F.3d at 201. *Amatel* relied on *Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 61 (1976), which stated, "there is surely a less vital interest in the uninhibited exhibition of material that is on the borderline between porn and artistic expression than in the free dissemination of ideas of social and political significance."*Id.* In *Amatel,* the court held that, in order for the scope of the regulation of expression to render it unconstitutional, the overbreadth must be real and substantial. See*Amatel,* 156 F.3d at 201 (quoting *Osborne v. Ohio,* 495 U.S. 103, 112 (1990)). In the instant case, Plaintiffs have not presented an adequate alternative that would have a narrower application. Defendants' policy of reviewing each publication individually is the narrowest application of the policy available. Plaintiffs' contention that the policy is applied inconsistently could be remedied only by wholesale exclusion of certain publications by title, which would lead to exclusion of individual issues that would otherwise have been acceptable under the policy. For these reasons, the Court concludes that the policy satisfies the fourth prong of the *Turner* test.

Because Defendants' policy clearly lies within the boundaries of what the Supreme Court and other courts have deemed legitimate policies, and because Plaintiffs have failed to demonstrate an adequate alternative, the Court will dismiss Plaintiffs' **First Amendment** claim.

### 3. Due Process Claim

Plaintiffs contend that their right of due process has been violated, because they receive no notice of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 5
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)

exclusion of prepaid magazines and because they have no means to appeal. In response, Defendants point to the language of the prison policy, in existence since since 1987, that provides for written notice and procedures for appeal. D.I. 38, C-4. Defendants also point to exhibits submitted by Plaintiffs that show both notice to Plaintiffs and correspondence between Plaintiffs and the Warden regarding an appeal.

In *Procunier v. Martinez*, 416 U.S. 396 (1974), the Supreme Court held that decisions by prison officials to withhold delivery of letters required minimum procedural safeguards, including notification to the **inmate** of the confiscation and a reasonable opportunity to protest the decision. *See id.* at 418-19. The Supreme Court recognized that the interest in uncensored communication by letter was a liberty interest, grounded in the **First Amendment**, protected by the Fourteenth Amendment despite the obvious qualifications of necessity due to prison circumstances. *See id.* Thus, the liberty interest is protected from arbitrary government invasion. *See id.* Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of pendency of action." *See Sullivan v. Barnett*, 139 F.3d 158, 172 (3d Cir.1998). Additionally, the right to be heard must "be granted at a meaningful time and in a meaningful manner to comply with the due process clause." *See id.* at 174. In the instant case, notice is provided to **prisoners** immediately after any negative evaluation of materials received through the mail, and **prisoners** have the option to send the publication to an outside source or donate it. (D.I.37, Ex. R-10). Additionally, within five days of receipt of the notification, **prisoners** may appeal the decision. *Id.* Plaintiffs argue that the notification letter does not contain the option to appeal and therefore does not provide a reasonable opportunity to be heard. Although the notification letter does not expressly explain the option to appeal, the prison policy explicitly lays out the appeal procedure. (D.I. 38, Ex. C-1 to 4). Additionally, Plaintiffs have utilized the appeal process in the past and have engaged in dialogue with prison officials regarding specific decisions to exclude materials. (D.I. 40, Ex. D-2; D.I. 37, Ex. R-1 to 4).

**\*6** Because Plaintiffs are notified of confiscation in a timely manner, have a right to appeal, and have actually utilized the appeal process, the Court concludes there is no due process violation, and accordingly will dismiss the Plaintiffs' due process claim.

### 4. *Affirmative Defenses*

Plaintiffs have brought this action against Defendants in both their official capacities and in their individual capacities. All Defendants are employees of the State of Delaware and are state actors. Defendants assert affirmative defenses to Plaintiffs' claims in both their individual capacities and their official capacities.

### A. *Sovereign Immunity Under the Eleventh Amendment*

Under the Eleventh Amendment, a state may not be sued in a federal court without its consent. U.S. Const., amend. 11. When an individual who works for the state is sued in their official capacity, the reality is that it is the state that will pay damages. Therefore, when an individual who works for the state is sued in their official capacity, it is the state, not the individual, being sued. *See Pagano v. Hadley*, 535 F.Supp. 92, 97 (D.Del.1982). The Eleventh Amendment thus bars lawsuits against state actors in their official capacities in a federal court. In the instant case, the Court concludes that Plaintiffs' cause of action against Defendants in their official capacities violates the Eleventh Amendment and must be dismissed.

### B. *Qualified Immunity*

Under the doctrine of qualified immunity, state officials may not be sued in their individual capacities for actions made during the performance of their official duties unless the conduct violated "clearly established" rights. *See Anderson v. Creighton*, 483 U.S. 635, 639 (1987). In analyzing whether an official is protected by qualified immunity, liability for allegedly unlawful actions turns on the "objective reasonableness" of the action "assessed in light of legal rules that were clearly established at the time action was taken." *See id.* The contours of the right must be "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *See id.* at 640. This does not mean that the prison official must know that a general right under the **First Amendment** exists or that a general right to due process exists, but that the right

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 1697539)**

is clearly established in a "more particularized ... and more relevant sense ." *Seeid.* In the instant case, the prison officials, in order to be liable, must have known that their particular actions, confiscating magazines containing sexually explicit material and nudity, violated the First or Fourteenth Amendment. The Court concludes that Defendants could not have known that their policy violated Plaintiffs' rights, because similar policies had been upheld by the United States Supreme Court and other courts in the past.

Because the Court has decided that Plaintiffs' rights were not in fact violated, and because, even if Plaintiffs' rights were violated, Defendants could not have known in light of precedent that they were violating Plaintiffs' rights, the Court concludes that the doctrine of qualified immunity shields Defendants from liability in their individual capacities for action taken during the performance of their official duties.

### CONCLUSION

*7 For the reasons discussed, Defendants' Motion to Dismiss will be granted.

An appropriate Order will be entered.

D.Del.,2003.
Jolly v. Snyder
Not Reported in F.Supp.2d, 2003 WL 1697539 (D.Del.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT C

be collected and inspected by security staff prior to the issue of a new razor.

C. **HAIRCUTS:** Haircuts shall normally be scheduled on the 8 to 4 shift as staffing permits.    Requests shall be made in writing to the Leadworker, who will schedule all haircuts.   Inmates are allowed only one haircut per month.  Inmates shall not be permitted to have haircuts while serving a sanction of cell confinement or segregated for disciplinary reasons.  No inmate other than the barber and the inmate pre-scheduled for the haircut shall be in the Barber Shop area. There will be no loitering inside or around the Barber Shop area.

D. **NAIL CLIPPERS:** Inmates may have in their cells, one pair (of each) of toe/fingernail clippers. Nail clippers are available for sale in the Commissary. Use of nail clippers shall be restricted to assigned cell.

## V. **AUTHORIZED CELL ITEMS**

A. **INMATE TRANSFERS:** When an inmate is transferred to another cell/housing unit, his property shall be inspected. When an inmate is transferred to a higher security level, his property shall be inventoried as well as inspected.  The inmate must cooperate with staff during property inventory and inspection.    Failure to cooperate will result in the removal of the inmate from the area to

### INMATE HOUSING RULES FOR MINIMUM SECURITY

a secure area while inspection and inventory are done, and a disciplinary referral will be made.

B. **CONFISCATED ITEMS:** Any confiscated items shall be inventoried. A copy of the inventory shall be given to the inmate. All items confiscated as contraband are forfeited by the inmate and will be held as evidence pending disciplinary and/or criminal proceedings. Any open food items will be discarded. Confiscated items are not returned to the inmate unless the inmate is found Not Guilty of the disciplinary referral and the item is permitted in accordance with the Housing Rules. If the inmate is found Not Guilty but the item(s) is not permitted in his housing unit, the inmate must utilize a Form 208 to designate desired disposal of the item. If the inmate is found Guilty of the rule infraction, the item(s) shall be disposed of in accordance with Institutional Operating Procedures.

C. **ITEMS ALLOWED:** The following items are permitted in Minimum Security cells. All other items are considered contraband.

1. Two cardboard boxes sized 14"x20"x12" will be used for storage of items underneath the bed of assigned cell. A locker box purchased from commissary is permitted in lieu of the cardboard boxes. A spare key must be given to leadworker.

4

## INMATE HOUSING RULES FOR MINIMUM SECURITY

2. A written request for an additional box for storage of legal materials for active case(s) can be made to the Deputy Warden II. The request must include the case number and court in which the pending case(s) is active. Approval of such will be in writing and must be retained in the box as proof of authorization. Failure to produce the written authorization at the direction of staff will be grounds for staff determining that there is no authorization, and the inmate will be referred for disciplinary action with the box and its contents being confiscated as contraband.

3. **TOILET ARTICLES**

   a. One toothbrush (issue or commissary)

   b. One tube of toothpaste (issue or commissary)

   c. One deodorant (commissary)

   d. One flexible plastic comb (5 inches or less), one plastic pick and/or one brush (military style - no handle) (commissary)

   e. One roll of toilet paper (issue)

   f. One tube or plastic bottle of shampoo (commissary)

   g. One tube or plastic bottle of hair conditioner (commissary)

   h. Up to two bars of soap (issue or commissary)

**INMATE HOUSING RULES FOR MINIMUM SECURITY**

        i.  One razor (issue)

4. **LINENS**

    a.  Two washcloths – white (issue or commissary)

    b.  Two towels – white (issue or commissary)

    c.  Blanket(s) – One, summer – Two, winter (issue)

    d.  Two sheets (issue)

    e.  One mattress (issue)

    f.  One pillow (issue)

    g.  One pillow case (issue)

5. **CLOTHING**

    a.  One pair sneakers – white (issue or commissary)

    b.  One pair shoes (issue)

    c.  Two white uniforms, shirt and trousers (issue) marked with "DOC" on back of shirt and on right leg of trousers. Workers will be issued one additional uniform.

    d.  Six T-shirts – white and with sleeves (issue or commissary)

    e.  Six undershorts – white (issue or commissary)

    f.  Six pair socks – white (issue or commissary)

    g.  One knit cap – white (issue or commissary)

    h.  One baseball cap – white (commissary)

    i.  Three handkerchiefs – white (commissary)

**INMATE HOUSING RULES FOR MINIMUM SECURITY**

    j.  One coat – white (issue)

    k.  One pair shower shoes or flip-flops (commissary)

    l.  One pair pajamas (commissary)

    m. Two sweatshirts – white (issue or commissary) with or without hood

    n.  Two sweatpants – white (commissary)

    o.  Two thermal underwear tops and/or bottoms – white (commissary) or (issued) if inmate works in inclement weather)

    p.  One bathrobe (commissary)

    q.  Two pair of gym shorts (commissary)

6. **PERSONAL ITEMS**

    a.  Two religious headwear – must pertain to the same faith and must be verified (commissary).

    b.  Two personal or library magazines, three library or personal reading books (which may include Bible and/or Koran), and one newspaper that does not promote illegal activity. These items must be purchased directly from the publisher and/or bookstore and must be mailed directly from the publisher or bookstore prepaid.  This does not include the approved education and treatment material described in Item C.  These materials must be kept in an

7

orderly manner.    Sexually explicit material is not permitted at the Delaware Correctional Center. Sexually explicit material is any pictorial or written depiction of actual or simulated sexual acts including sexual intercourse, oral sex, and/or masturbation; any pictorial or written demonstration, depiction, or symbolization of nudity, frontal or otherwise; and any promotion of sexual activity of any manner.    All sexually explicit items are considered contraband except publications containing nudity illustrative of medical, educational, and anthropological content and material of a news information type such as publications covering activities of gay or religious groups.    To be permitted into the Delaware Correctional Center, the sexually explicit material must have scholarly value or general social or literary value.    No distinction is made between depiction of heterosexual or homosexual activity in enforcing this policy.    As with all items not permitted, when a sexually explicit publication, picture, or other item is received at DCC through the mail, a notice will be sent to the inmate and the sender notifying them that the item is not permitted into the Institution.    The inmate will have five

8

## INMATE HOUSING RULES FOR MINIMUM SECURITY

days to notify the Institution Mail Room of how to dispose of the item (donate to a charitable organization, mail out of Institution at inmate's expense, or appeal the mailroom rejection to the Support Service Manager). Failure to notify the Mail Room of the requested method of disposition within five days will result in the item being disposed of according to the institutional operating procedures.

c. The Treatment and Education Departments will maintain a list of the educational material required for the particular classes/programs to which an inmate is assigned. The list will include timeframes specific to the class/program in which the named inmate is participating with an expiration date and whether the material must be returned to the Education and/or Treatment Departments. The list will be updated on computer-shared files. If the material is not required to be returned to the Education and/or Treatment Departments, the inmate must either send the material out of the Institution or make the adjustment to his personal property to ensure compliance with the inmate housing rules.

9

# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DONALD BOYER, AMIR FATIR, and )
WARREN WYANT, )
         )
         Plaintiff, )
         )     C.A. No. 06-694-GMS
    v. )
         )     Jury Trial Requested
COMMISSIONER STANELY TAYLOR, et al., )
         )
         Defendants. )

## AFFIDAVIT OF RONALD HOSTERMAN

I, Ronald Hosterman, having been duly sworn by law, do hereby depose and state as follows:

1.     I am employed by the State of Delaware Department of Correction ("DOC") as a Correctional Treatment Administrator at the Delaware Correctional Center ("DCC"), in Smyrna, Delaware. I have been employed by the DOC for almost 37 years and worked at the DCC for most of those years.

2.     The DCC Housing Rules state that each inmate classified to minimum or medium security is allowed to have three library or personal reading books in his cell at one time. These three books may include a Bible and/or a Koran. In addition, an inmate can receive authorization for additional education or treatment books, but only if the inmate is enrolled in an education or treatment program and only for the term of the program.

3.     The purpose of the rule restricting the number of books an inmate is permitted in his cell is to limit the extent of combustible materials in the cells. The DCC

1

has been advised by the Delaware State Fire Marshall to limit the number of combustible materials in inmate cells to prevent fire and safety hazards.

4. When an inmate is finished reading one of the three books in his cell, he may donate the book to the DCC library or have the book mailed to a designated recipient. Once an inmate donates a book or mails it out and has less than three books in his cell, he can then have another book shipped to him or check out a book from the thousands of books available in the DCC library.

Ronald Hosterman

**SWORN AND SUBSCRIBED** before me this ___8___ day of ___July___, 2008.

Notary

2

# EXHIBIT E



*Delaware Correctional Center*   Education / B-Bldg.

# Main Library Status and Activity Report

## Status as of Wednesday, June 18, 2008

Books In Circulation......................7,689

    Books In House........... 6,970

    Books Checked Out..... 453

    Books Renewed........... 17

    Books Over Due.......... 249

Books In Storage...................................... 217

Books Missing........................................... 443

Books Reserved........................................ 55

Patrons on Reserve List............................ 59

Patrons Scheduled.........................410

Patrons Waiting to be Scheduled............. 19

| Time | Mon | Tue | Wed | Thu | Fri | Sat | Sun |
|------|-----|-----|-----|-----|-----|-----|-----|
| 9:00AM | 31 | 39 | 21 | 23 | 15 | | |
| 12:30PM | 28 | 29 | 35 | 27 | 29 | | |
| 1:30PM | 23 | 27 | 37 | 27 | 19 | | |

## Activity between 6/13/2005 and 6/13/2006

Books Checked Out...................... 8,060

Books Returned............................. 7,875

Books Returned Damaged.............. 1

Books Renewed............................. 2,065

Books Over Due............................ 2,690

Books Reserved............................. 410

Books Missing............................... 520

Missing Books Recovered............. 316

Books Discarded............................ 1

Patrons Scheduled......................... 15,972

    Present........................9,168

    Absent.........................6,804

Books Put In Storage.................................34

Books Returned From Storage..................3

Books Added to Inventory........................256

    Donated By Inmate..............171

    Purchased By DCC.............. 1

    Donated By Dover Library....0

    Donated By Staff.................7

    Donated Anonymously..........74

    Donated By Friends of the Newark Free Library................................ 0

    Unknown............................. 3

Regarding Activity Information: Please Note most information will not be accurate before the date of 7/1/2002.
The total for Patrons Scheduled should be relatively correct since 1/22/2001, however attendance may not be accurate.
The total for Books Checked Out should be relatively correct since 7/15/1992.