IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DONALD BOYER, AMIR FATIR, and WARREN WYANT, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Civil Action No. 06-694-GMS ) |
| COMMISSIONER STANLEY TAYLOR, et al., | ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION

The plaintiffs, Donald Boyer ("Boyer"), Amir Fatir ("Fatir"), and Warren Wyant

("Wyant) (collectively "the plaintiffs") are inmates at the James T. Vaughn Correctional Center

("VCC"),[1] Smyrna, Delaware. The plaintiffs appear *pro se* and were granted permission to

proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915.

## I.     FACTS AND PROCEDURAL BACKGROUND[2]

The plaintiffs filed their complaint, an amendment and were given leave to amend their

claims, all having been screened by the court. (D.I. 10, 18, 40, 43, 44.) Numerous claims and

defendants have been dismissed, and the case proceeds on the following claims: (1) conditions

of confinement in counts 1, 2, 3, 4, 5, 6, 9, 12, 13, and 15; (2) First Amendment in counts 20,

21, 23, and a portion of count 36; (3) Equal Protection in counts 31 and 42; (4) inmate accounts

in counts 32 and 39; (5) excessive force in count 45; (6) retaliation in count 52; and (7) medical

---

[1]The VCC was formerly known as the Delaware Correctional Center. The court refers to
the facility by its current name.

[2]The relevant facts for each issue are set forth in the body of the Discussion.

needs in count 50.[3] (*See* D.I. 39, 65, 203.) The remaining defendants include former Delaware

Department of Correction ("DOC") Commissioner Stanley Taylor ("Taylor"), Ronald

Hosterman ("Hosterman"), former Warden Thomas Carroll ("Warden Carroll"), Maureen

Whalen ("Whalen"), Deputy Warden David Pierce ("Pierce"), Jenny Havel ("Havel"), Janet

Henry ("Henry"), Michael Little ("Little"), Floyd Dixon ("Dixon"), Sgt. Marvin Creasy

("Creasy"), James P. Satterfield ("Satterfield"), Inspector Lt. Pawlowski ("Pawlowski"), Sgt.

Bailey ("Bailey"), First Correctional Medical ("FCM"), and David Hall ("Hall"). The plaintiffs

seek injunctive relief and compensatory and punitive damages. The court has jurisdiction

pursuant to 28 U.S.C. 1331.

Before the court is the State defendants' ("the defendants") motion for summary

judgment, the plaintiffs' opposition, and the defendants' reply. (D.I. 312, 327, 329.) The

defendants move for summary judgment on all remaining claims.

## II.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the clams in question. *See Celotex Corp. v. Catrett*, 477 U.S.

317 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a

dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury

to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir.

2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[3] The medical needs claim is raised against FCM. Despite several attempts, service has not been effected upon FCM.

The burden then shifts to the non-movant to demonstrate the existence of a genuine

issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986);

*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-461 (3d Cir. 1989). Pursuant to

Rule 56(c)(1), a non-moving party asserting that a fact is genuinely disputed must support such

an assertion by: "(A) citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations . . .,

admissions, interrogatory answers, or other materials; or (B) showing that the materials cited

[by the opposing party] do not establish the absence . . . of a genuine dispute . . ." Fed. R. Civ.

P. 56(c) (1).

When determining whether a genuine issue of material fact exists, the court must view

the evidence in the light most favorable to the nonmoving party and draw all reasonable

inferences in that party's favor. *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v.*

*Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such

that a reasonable jury could return a verdict for the non-moving party. *See Anderson*, 477 U.S.

at 247-249. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 586–587 ("Where the record taken as

a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

'genuine issue for trial.'"). If the nonmoving party fails to make a sufficient showing on an

essential element of its case with respect to which it has the burden of proof, the moving party is

entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

## III.   DISCUSSION

### A.   Boyer's Deposition

The defendants move for dismissal of Boyer pursuant to Fed. R. Civ. P. 37(d) and for

failure to prosecute on the grounds that he "blatantly refused to answer any questions regarding

3

the case during his deposition." The plaintiffs respond that Boyer was within his rights to refuse to answer questions during the deposition since, due to the failure of the defendants to provide him with the court's order and filings in the case, Boyer was unaware that he had been ordered to participate in discovery. In addition, the plaintiffs opine that Boyer's refusal was proper because the court had yet to rule on a motion for Fatir to attend Boyer's deposition.[4] Finally, the plaintiffs argue that Boyer is aged, was confused about the deposition process, and did not have his glasses with him. The plaintiffs contend that, rather than dismissal, the defendants should have filed a motion to compel pursuant to Fed. R. Civ. P 37(a).

The record reflects that on August 19, 2008, the court granted the defendants leave to depose Boyer. (D.I. 163.) The court docket receipt indicates that the order was mailed to Boyer at the address provided to the court, and it was not returned as undeliverable. When Boyer appeared for his deposition on September 23, 2008, he declined to participate because he believed that the court was required to appoint counsel to represent him at the deposition. (D.I. 313, ex. K at 1.) Boyer was shown a copy of the August 19, 2008 order but stated that he "never got that order." (*Id.*) Because did not have his glasses with him, counsel for the defendants read the August 19, 2008 order to him. (*Id.*) After the order was read to him, Boyer continued to refuse to participate in his deposition stating that "all of us are supposed to be together when we take this deposition," meaning himself and the other two plaintiffs. (*Id.*) Counsel for the defendants attempted to proceed with the deposition, but Boyer reiterated that he was "not going to take this." (*Id.* at 2.)

---

[4]The court denied the motion on December 1, 2008. (*See* D.I. 183.)

4

Counsel for the defendants next explained to Boyer that if he refused to continue with the deposition, the defendants would move to dismiss for Boyer's refusal to participate in the discovery process. (*Id.*) Boyer responded that he intended to write the court to explain that he wanted counsel to represent him before he was deposed. (*Id.*) Boyer was clear that he was not going forward with his deposition because he had not been appointed counsel. (*Id.* at 3.) Boyer did not request counsel until August 5, 2010, some two years later, and his motion made no mention that he required counsel before he could be deposed. (*See* D.I. 242.)

The defendants rely upon Fed. R. Civ. P. 37(d) which provides that when a party fails to appear for a properly noticed deposition, the court may impose sanctions. They also move for dismissal pursuant to *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 868 (3d Cir. 1984), for Boyer's failure to prosecute. The *Poulis* factors include: (1) the extent of a party's responsibility; (2) the prejudice to the adversary caused by the party's actions or inactions; (3) a history of dilatoriness; (4) whether the conduct of the party was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal; and (6) the merit of the claim or defense. *Id.* at 868.

The court finds that Boyer's dismissal is appropriate because a substantial number of *Poulis* factors have been met. As the facts substantiate, Boyer is solely responsible for his abuse of the discovery process; the defendants have been prejudiced by the expenditure of time, effort, and their inability to prepare a full and complete trial strategy; Boyer's conduct was willful; inasmuch as Boyer proceeds *in forma pauperis*, it is doubtful that monetary sanctions would be effective and there are no alternative sanctions the court could effectively impose; and

5

finally, while Boyer alleges violations of his constitutional rights, the defendants have provided evidence to the contrary.[5]

The court finds that the *Poulis* factors weigh in favor of Boyer's dismissal. Therefore, the court will grant the defendants' motion to dismiss Boyer for his refusal to participate in his deposition.

## B.   Wyant's Administrative Remedies

The defendants' move for the dismissal of Wyant on the grounds that he testified during his deposition that he did not exhaust his administrative remedies. The plaintiffs respond that during his deposition Wyant was forced to provide a legal opinion that he only has two issues in the case, he is not qualified to provide the opinion, and he "misspoke." The plaintiffs further argue that Wyant was not required to personally file a grievance for each of the counts of this lawsuit; that each of the claims were properly grieved and exhausted by other plaintiffs; and that the Prison Litigation Reform Act ("PLRA") does not required that each plaintiff to individually grieve each issue.

During his deposition, Wyant testified that only two issues were raised in the complaint on his behalf: the prison commissary account claims and the D-Building conditions of confinement claims. (D.I. 313, ex. L at 3-8.) He further testified that he did not file written grievances for either issue. (*Id.* at 8, 12.)

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other

---

[5]The court notes that Boyer has not been signing court filings, as is required. His signature block consistently states the following, "Donald Boyer (in SHU & cannot sign)." It is unknown if Boyer is aware of the arguments that have been made on his behalf.

6

correctional facility until such administrative remedies as are available are exhausted." 42
U.S.C. § 1997e(a); *see Porter v. Nussle*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion
requirement applies to all inmate suits about prison life, whether they involve general
circumstances or particular episodes, and whether they allege excessive force or some other
wrong."). The defendants have the burden of pleading and proving failure to exhaust
administrative remedies as an affirmative defense in a § 1983 action. *Ray v. Kertes*, 285 F.3d
287, 295-96 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the
forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S.
731, 741 n.6 (2001). Exhaustion means proper exhaustion, that is, "a prisoner must complete
the administrative review process in accordance with the applicable procedural rules, including
deadlines, as a precondition to bringing suit in federal court." *Woodford v. Ngo*, 548 U.S. 81,
88 (2006). Other plaintiffs' submissions of grievances do not extend to Wyant.[6]

"'[P]rison grievance procedures supply the yardstick' for determining what steps are
required for exhaustion." *Williams v. Beard*, 482 F.3d 637, 639 (3d Cir. 2007) (quoting *Spruill
v. Gillis*, 372 F.3d 218, 231 (3d Cir. 2004)). A prisoner must complete the administrative
review process in accordance with the applicable procedural rules in order to satisfy the
exhaustion requirement of the PLRA. *Nickens v. Department of Corr.*, 277 F. App'x 148, 152
(3d Cir. 2008) (unpublished) (citing *Williams*, 482 F.3d at 639; *Spruill*, 372 F.3d at 228, 231).

---

[6]"Vicarious exhaustion" is not recognized in cases except in some circuits when it has
been permitted in § 1983 class actions filed by inmates. *See Chandler v. Crosby*, 379 F.3d 1278
(11th Cir. 2004); *Meisberger v. Donahue*, 245 F.R.D. 627 (S.D. Ind. 2007) (allowing vicarious
exhaustion in a class action), *cf. McGoldrick v. Werholtz*, 185 F. App'x 741 (10th Cir. 2006)
(unpublished) ("vicarious exhaustion" rejected where a class had not been certified, on the
grounds that a *pro se* plaintiff cannot in any manner represent another for any purpose).

7

Perfect overlap between the grievance and an amended complaint is not required by the PLRA

as long as there is a shared factual basis between the two. *Jackson v. Ivans*, 244 F. App'x 508,

513 (3d Cir. 2007) (unpublished) (citing *Woodford*, 548 U.S. at 95 ("The benefits of exhaustion

can be realized only if the prison grievance system is given a fair opportunity to consider the

grievance."). A futility exception to the PLRA's mandatory exhaustion requirement is

completely precluded. *Banks v. Roberts*, 251 F. App'x 774, 776 (3d Cir. 2007) (unpublished)

(citing *Nyhuis v. Reno*, 204 F.3d 65, 71 (3d Cir. 2000). The exhaustion requirement is absolute,

absent circumstances where no administrative remedy is available. *See Spruill,* 372 F.3d at

227-28; *Nyhuis*, 204 F.3d at 67.

Wyant has failed to exhaust his administrative remedies. Wyant testified that he did not

submit grievances for the claims raised on his behalf, and the time to file a grievance has long

passed. It is clear, upon review of the record, that Wyant did not fully exhaust his

administrative remedies prior to filing suit as is required by the PLRA. Therefore, the court will

grant the defendants' motion to dismiss Wyant as a plaintiff for his failure to exhaust his

administrative remedies.

## C.   **Eleventh Amendment**

The defendants move for summary judgment on the basis of Eleventh Amendment

immunity to the extent that the claims are raised against them in their official capacities. The

plaintiffs respond that the Eleventh Amendment gives "some immunity" to the States, but does

not give individual prison workers immunity.

The Eleventh Amendment of the United States Constitution protects an unconsenting

state or state agency from a suit brought in federal court by one of its own citizens, regardless of

the relief sought. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996); *Pennhurst*

8

*State Sch. & Hosp. v. Halderman*, 465 U.S. 89 (1984); *Edelman v. Jordan*, 415 U.S. 651
(1974). "[A] suit against a state official in his or her official capacity is not a suit against the
official but rather is a suit against the official's office. As such, it is no different from a suit
against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)
(internal citations omitted); *Ali v Howard*, 353 F. App'x 667, 672 (3d Cir. 2009) (unpublished).
Accordingly,

§ 1983 claims for monetary damages against a state, state agency, or a state official in his
official capacity are barred by the Eleventh Amendment. *See id.*

Based upon the foregoing, the court will grant the defendants' motion for summary
judgment for the claims for monetary damages raised against them in their official capacities.

### D.    Eighth Amendment

Counts 1, 2, 3, 4, 5, 6, 9, 12, 13, and 15 raise Eighth Amendment claims for the
conditions of confinement in the D-Building.  Count 45 alleges that the use of "box handcuffs"
violate the Eighth Amendment.  The conditions of confinement claims are brought against
Taylor, Carroll, Pierce, Henry, Dixon, Creasy, Satterfield, and Palowski, and the handcuffs
claim, raised only by Fatir, is brought against Hall.[7]  The defendants move for summary
judgment on grounds that the conditions were not sufficiently serious and the defendants were
not knowingly and intentionally indifferent to the plaintiffs' health or safety.  They further argue
that, despite their allegations, none of the plaintiffs claims to have suffered any illness as a

---

[7]Count 45 was amended at D.I. 44.  The plaintiffs were only allowed to proceed against
Hall.  (*See* D.I. 65 at 11.)  The plaintiffs' opposition argues that Hall, Carroll, *et al.*, placed
Fatir's life at risk.

9

result of living in D-Building.[8] The plaintiffs respond that there remain issues of fact and, therefore, summary judgment is not proper.

A condition of confinement violates the Eighth Amendment only if it is so reprehensible as to be deemed inhumane under contemporary standards or such that it deprives an inmate of minimal civilized measure of the necessities of life. *See Hudson v. McMillian*, 503 U.S. 1, 8 (1992); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). To determine if a prisoner's confinement conditions violate the Eighth Amendment, "[a] totality of the circumstances test must be applied to determine whether the conditions of confinement constitute cruel and unusual punishment." *Tillery v. Owens*, 907 F.2d 418, 426 (3d Cir. 1990). When an Eighth Amendment claim is brought against a prison official it must meet two requirements: (1) the deprivation alleged must be, objectively, sufficiently serious; and (2) the prison official must have been deliberately indifferent to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Under the first prong of the *Farmer* test, the plaintiffs must demonstrate that they have suffered a "sufficiently serious" constitutional deprivation. *Id.* at 834. This means that a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities." *Id.* at 834 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). Thus, "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)). Prison conditions "must not

---

[8]The record contains Fatir's medical records. (D.I. 148.) The court reviewed the records and found no complaints by Fatir that he contracted a disease or condition, or was harmed in any way, as a result of the conditions in D-Building. In addition, physicians' notes do not attribute any of Fatir's health issues to the conditions in D-Building. Fatir has sleep apnea, high blood pressure, and is enrolled in the cardiac chronic care clinic. The court was not provided with the records of Boyer or Wyant.

involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." *Rhodes* 452 U.S. at 347.

Under the second part of the *Farmer* test, if an Eighth Amendment claim arises in the context of a challenge to conditions of confinement, the court must determine if prison officials acted with "deliberate indifference" to the inmate's health or safety. *Farmer*, 511 U.S. at 837. The test for "deliberate indifference" by prison officials in prison conditions cases is not an objective test of what a reasonable official in the same positions should have known, but a subjective test based on "what the prison official actually knew." *See Beers-Capitol v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001). Under this test, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. However, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842. A defendant's knowledge of a risk can be proved indirectly by circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. *See Beers-Capitol*, 256 F.3d at 131 (citations omitted). To survive summary judgment in a prison conditions case, a plaintiff "must come forward with evidence from which it can be inferred that the defendant- officials were at the time the suit was filed, and are at the time of summary judgment, knowingly and unreasonably disregarding an objectively intolerable risk of harm." *Beers-Capitol*, 256 F.3d at 132 (citing *Farmer* at 511 U.S. at 846).

Supervisory claims against prison officials are analyzed under the four-prong test set forth in *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989). For supervisory liability based upon

11

policies or practices, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. *Beers-Capitol*, 256 F.3d at 134 (citing *Sample*, 885 F.2d at 1118).

### 1.    Conditions of Confinement

The plaintiffs allege uninhabitable conditions in D-building, including: (1) mold and fungus in the shower and filthy bathrooms (Counts 1, 3, and 9); (2) improper ventilation (Counts 2 and 13); (3) double bunking and being celled with inmates carrying infectious disease (Counts 4 and 15); (4) soil and water contamination and insufficient access to water (Counts 5 and 6); and (5) soiled mattresses (Count 12).

Pawlowski is responsible for inspecting all the facilities at the VCC. In his March 19, 2008 affidavit, he opines that, while there are some problems with the D-Building at the VCC, the building is habitable. (D.I. 313, ex. B, Pawlowski aff.) Fatir lived on D-tier in the D-Building from January 2006 until June 21, 2007. (D.I. 327, ex. L, Fatir aff.)

### a.    Mold, Fungus, and Filthy Bathrooms, Counts 1, 3, and 9

The plaintiffs allege that mold, fungus, and filthy bathrooms endangered and placed their health in peril. Steven A. White ("White") lived on D-tier in the D-Building during the relevant time period. According to Fatir and White, the D-tier showers were infested with fungus and mold. Prison officials painted over the fungus and mold, but did not remove it. Fatir and White state that when the showers are turned on, steam rises, and the mold and fungus becomes airborne and is inhaled. In addition, there are no urinals or toilet stalls on D-tier. As a result, inmates defecate in public. According to White, the latrines used by inmates are almost

12

never clean. Also according to White and Fatir, the inmate janitors, who clean once a week, were not provided bleach, protective clothing, or special cleansers to remove the fungus and mold and to clean the showers and bathrooms. On unknown dates, both Fatir and White brought the problems to the attention of Pawlowski. White also alerted Henry, Pierce, and Dixon to the problems. (D.I. 327, ex. L, Fatir aff. and White affs.)

Pawlowski's last inspection of the D-Building took place in August 2007. Fatir was no longer housed in D-Building at that time. Pawlowski's inspection found paint peeling off the shower walls and ceiling and mold and mildew in the showers. He submitted work orders to maintenance to address the peeling paint and mold and mildew. According to Pawlowski, the only place he found mold or mildew was in the shower and no other part of D-Building. The latrines were clean. (D.I. 313, ex. B, Pawlowski aff.)

### b.     Ventilation, Counts 2 and 13

The plaintiffs allege that D-Building's improper ventilation system impairs breathing and causes respiratory ailments and infectious diseases. According to Fatir, there are no working vents on the tiers or in the cells. According to Pawlowski, any poor ventilation in the D-Building is attributable to inmates blocking air supply vents in their cells. White has never witnessed or heard of inmates blocking the air supply at its source which is in the penthouse of D-Building, but does acknowledge that some inmates have temporarily blocked vents when the seasons change and the heat remains on during warm weather until the heat pump is switched off.

According to Pawlowski, inmates are required, and told, to keep the air supply vents clean. The inmate workers are responsible for dusting the vents. Pawlowski avers that the intake vents in D-Building are functional but, at times, get dusty. According to White, the

13

exhaust system in D-Building is antiquated and usually inoperable. White brought the problems of poor air quality and lack of ventilation to Henry, Palowski, Pierce, and Dixon. According to inmate Daniel Woods ("Woods"), on an unknown date, he overheard White and two maintenance workers discussing the air handlers, dirty filters, and the failure of cleaning and maintenance. (D.I. 313, ex. B, Pawlowski aff.; D.I. 327, ex. B, Woods aff.; ex. L, Fatir aff. and White affs.)

Pawlowski indicates that the intake vents in D-Building are functional, but get dusty. Pawlowski attributes problems with the ventilation system to inmates blocking air supply vents and White corroborated that, at times, inmates do block the vents.

### c. Bunking Conditions, Counts 4 and 15

The plaintiffs allege that they are double-bunked for life in a cell designed for one individual and that inmates are forced to bunk with inmates who have infectious or communicable diseases. To support their claims, the plaintiffs provide the undated affidavit of inmate Nakei Gibbs ("Gibbs"), who, for a time, had a cell-mate who suffered from Hepatitis C. (D.I. 313, ex. B, ex. M. Gibbs aff.)

"Double or triple-bunking of cells, alone, is not per se unconstitutional." *North v. White*, 152 F. App'x 111, 113 (3d Cir. 2005) (unpublished) (citing *Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 1000 (3d Cir. 1983); *Rhodes v. Chapman*, 452 U.S. at 352. Doubling celling may, however, amount to cruel and unusual punishment if combined with other adverse conditions. *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996). Considerations that are relevant in determining if double celling violates the Eighth Amendment "include the length of confinement, the amount of time prisoners spend in their cells each day, sanitation, lighting, bedding, ventilation, noise, education and rehabilitation programs, opportunities for activities

14

outside the cells, and the repair and functioning of basic physical facilities such as plumbing, ventilation, and showers." *Id.*

Here, the plaintiffs also allege that inmates are forced to bunk with inmates who have infectious or communicable diseases that places their lives at risk and presented evidence of the same. *See e.g.*, *Bolton v. Goord*, 992 F.Supp. 604, 628 (S.D.N.Y. 1998) (finding that inmate was not injured by exposure to HIV-positive inmate in double cell because HIV is not airborne or spread by casual contact; inmates can state an Eighth Amendment claim for confinement in a cell with an inmate who has a serious contagious disease that is spread by airborne particles, such as tuberculosis; but, rejecting claim because prisoner had not shown that inmates with active infectious tuberculosis were double-celled).

### d. Soil and Water Contamination, Counts 5 and 6

The plaintiffs allege the soil at the VCC is contaminated with radon and other legal gases and that the water in D-Building is contaminated. According to Pawlowski, the water in D-Building is drinkable. Pawlowski drinks from the water fountains in the D-Building and has done so during his 19-year tenure with the VCC he with no ill consequences. He has seen nothing but water run from the spigots. Pawlowski has no knowledge of an advisory warning the staff not to drink the water in D-Building. (D.I. 313, ex. B, Pawlowski aff.)

According to White, during his decades of imprisonment, he has never seen Pawlowski drink from the spigots in D-Building. This is only water available to prisoner on the tiers, and it is the bathroom. White states that when the water in the bathroom is turned on, the sink water smells of urine and, occasionally, the water is brown. The plaintiffs produced a notice that

15

advised all tiers in the Security Housing Unit ("SHU"), Building 17[9] were advised to use as much water as possible and to flush the toilets as much as possible between May 11, 2007 and May 13, 2007, to allow the water system to be flushed out. (D.I. 313, ex. B, Pawlowski aff.; D.I. 327, ex. A; ex. L, White aff.)

The plaintiffs also provided an undated newspaper article that the Environmental Protection Agency had proposed a large fine for violations of clean air and water regulations at the VCC.[10] The article indicated that no spills or leaks of hazardous materials had occurred at the prison. (D.I. 327, ex. A.)

### e. Mattresses, Count 12

The plaintiffs alleges that the mattresses in the D-Building cells are unsanitary and a health hazard, without coverings to protect them from disease. According to Pawlowski, the mattresses in the D-Building are periodically replaced by the institution. Contaminated mattresses are discarded. According to White, mattresses in D-Building are seldomly replaced and usually only after inmates "raise hell" to get a replacement of a filthy mattress that has been used by a number of inmates over the years. According to inmate Gibbs, his cell-mate could not control his bowels and soiled his mattress. When the cell-mate was transferred, the soiled mattress was not removed. (D.I. 313, ex. B, Pawlowski aff.; D.I. 327, ex. L, White aff., ex. M. Gibbs aff.)

---

[9]It is unclear if D-Building and Building 17 are the same buildings.

[10]The court does not consider the public notice that states July 2000 water samples revealed contamination at the VCC. This evidence does not pertain to the relevant time period as alleged in the complaint. (D.I. 327, ex. A.)

16

After viewing the evidence of record and looking at the totality of the conditions in D-Building, the court concludes that there remain genuine issues of fact as to the whether the defendants violated the plaintiffs conditions of confinement while there were housed there. For example, the defendants acknowledge the mold and fungus problems, as well as the ventilation problems. In doing so, rather than identify a remedy to the conditions, the defendants blame the inmate janitors and the inmate population, in general, for the conditions. Moreover, there is disputed evidence with regard to the drinking water, the cleanliness of the bathrooms, and whether inmates in D-Building are actually provided sanitary mattresses. It appears that the alleged conditions lasted during the entire time that the plaintiffs were housed in D-Building; for Fatir that was approximately one and one-half years. Finally, the mold and fungus, ventilation issues, and suspect water, all, objectively could constitute excessive risks to an inmate's health or safety. The question is, whether prison officials knew of and disregard an excessive risk to an inmate's health or safety; at this juncture, the answer is unknown.

For these reasons, the court will deny the defendants' motion for summary judgment as to Counts 1, 2, 3, 4, 5, 6, 9, 12, 13, and 15.

### 2.    Handcuffs, Count 45

Fatir alleges that the use of "box handcuffs"[11] cuts off circulation and causes health issues for inmates with high blood pressure, heart ailments and/or circulation ailments in danger of stroke, cardiac arrest and/or death. The defendants move for summary judgment on the

---

[11]The black box restraints consist of handcuffs, black box, waist chain, and shackles, and is used for transportation. *Ranier v. Delaware Dep't of Corr.*, 2010 WL 5343200, at *2 (D. Del. Dec. 15, 2010).

17

excessive force claim. Fatir responds that the claim should be characterized as deliberate indifference in violation of the prohibition against cruel and unusual punishment.

In 2007, Fatir was transported for medical care outside of the VCC and each time box handcuffs were used during the transportation.[12] He alleges that his blood pressure was checked upon his return to the VCC, and each time it was elevated following the use of the "box handcuffs." Fatir submitted a grievance complaining that the "box handcuffs" used to transport him were dangerous to his health. According to Fatir, the cuffs cut-off his circulation and interfered with blood flow. Fatir has high blood pressure and circulation ailments and he believes the box cuffs could kill him. Fatir was advised that the procedure used was for safety and security. (D.I. 313, ex. C.)

To the extent Fatir raises an excessive force claim, the claim fails. When analyzing an excessive force claim under the Eighth Amendment, the court must determine "whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986) (citations omitted). Use of force is actionable under § 1983 when it exceeds "that which is reasonable and necessary under the circumstances." *Davidson v. O'Lone*, 752 F.2d 817, 827 (3d Cir. 1984). The court must determine whether the force was applied in good faith by weighing the following factors: (1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, (4) the threat reasonably perceived by the responsible officials, and (5) the efforts made to

---

[12]Fatir is serving a life sentence for murder in the first degree. He also escaped from prison. (D.I. 105, exs. A, D.)

temper the severity of a forceful response. *Davis v. Carroll*, 390 F. Supp. 2d 415, 419 (D. Del. 2005) (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

While Fatir complains of discomfort when cuffed, complaints of "discomforts and irritations," do not rise to the level of an Eighth Amendment claim. *See Barker v. Fugazzi*, 18 F. App'x 663 (9th Cir. 7, 2001) (unpublished). Also, "prison officials may place inmates in restraints while transporting them from place to place." *Id.*; *see also, Fulford v. King*, 692 F.2d 11, 13-14 (5th Cir. 1982) (the transport of prisoners outside of a correctional institution poses obvious security risks which clearly justify the use of hand-cuffs or other appropriate restraints.). Notably, in the past, Fatir escaped from prison.

In addition, Fatir's allegations of "injury" by reason of his elevated blood pressure following use of the box cuffs are not serious enough to satisfy the objective component of an Eighth Amendment claim. Fatir references one instance of elevated blood pressure that caused him to "fear imminent death from heart attack or stroke." Notably, neither occurred. Nor does the evidence of record give rise to an inference that the defendants wilfully disregarded an excessive risk to his safety, necessary to satisfy the deliberate indifference standard of the Eighth Amendment claim. Instead, the record indicates the cuffs were used for safety and security. Moreover, Fatir's statement that upon his return to the VCC his blood pressure was checked, runs contrary to a finding of deliberate indifference to his medical condition by prison officials.

There is no evidence of record that identifies the individual or individuals who actually placed the cuffs on Fatir. Fatir's conclusory statements that "Hall, Carroll, et al." were personally involved is not borne by the record. Finally, Fatir's statement that "under the doctrine respondeat superior, there is no requirement that a defendant personally slap on the box

19

handcuffs to be liable" is contrary to the law. The Third Circuit has reiterated that a § 1983

claim cannot be premised upon a theory of respondeat superior and, that in order to establish

liability for deprivation of a constitutional right, a party must show personal involvement by

each defendant. *Brito v. United States Dep't of Justice*, 392 F. App'x 11, 14 (3d Cir. 2010)

(unpublished) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Rode v. Dellarciprete*, 845

F.2d at 1207). Supervisory liability may attach if facts show that the supervisor's actions were

"the moving force" behind the harm suffered by the plaintiff. *See Sample v. Diecks*, 885 F.2d at

1117-118. There is no evidence of record that Hall expressly directed the deprivation of Fatir's

constitutional rights, or that he created policies wherein subordinates had no discretion in

applying them in a fashion other than the one which actually produced the alleged deprivation.

Therefore, the court will grant the defendants' motion for summary judgment as to

Count 45.

### E.     First Amendment, Counts 20, 21, 23, 36

The plaintiffs raise four counts under the First Amendment. In his opposition to the

motion for summary judgment, Fatir now asserts that Counts 20 and 21 fall under the Religious

Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000, *et seq.*, because

*The Multi-Orgasmic Woman*, and *Shakti: the Feminine Power of Yoga* are religious books and

studied for spiritual purposes. The defendants correctly note that the complaint and

amendments make no mention of RLUIPA claims. Only in response to the defendants' motion

for summary judgment did the plaintiffs first raise RLUIPA. A plaintiff "may not amend his

complaint through arguments in his brief in opposition to a motion for summary judgment."

*Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) (unpublished) (citing

*Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996); *see also Gilmour v. Gates,*

*McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a)."). Accordingly, the claims are analyzed under the First Amendment and the four-part test under *Turner v. Safley*, 482 U.S. 78 (1987).

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Although "prisoners do not forfeit all constitutional protections," it is settled that "[t]he fact of confinement as well as the legitimate goals and policies of the penal institution limit these retained constitutional rights." *Bell v. Wolfish*, 441 U.S. 520, 545, 546 (1979); *see also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003). "[R]estrictive prison regulations are permissible if they are 'reasonably related to legitimate penological interests,' and are not an 'exaggerated response' to such objectives." *Beard v. Banks*, 548 U.S. 521, 528 (2006) (quoting *Turner*, 482 U.S. at 87).

### 1. Censorship of Books, Counts 20 and 21

Count 20 is raised on behalf of Fatir. It alleges that books Fatir ordered were improperly seized and destroyed. The books at issue are *The Catcher in the Rye*, *Natural Cures They Don't Want You to Know About*, *Ishmael*, and *The Multi-Orgasmic Woman*. Fatir alleges the seizures violated his rights under the First and Fourth Amendments. More particularly, Count 20 alleges that *The Multi-Orgasmic Woman* is not obscene and is an educational book of scholarly nature. Count 21, amended at D.I. 40, alleges that in rejecting *Shakti: the Feminine Power of Yoga*, the DOC's censorship is overly broad, arbitrary and capricious, and violates the DOC's Policy 4.5. The defendants contend that the VCC's policy of rejecting pornography satisfied the *Turner* test and does not violate Fatir's First Amendment rights.

21

The defendants address only the rejection of *Shakti*. In a footnote, the defendants state that Fatir did not exhaust his administrative remedies as to the rejection of *The Multi-Orgasmic Woman*. As discussed above in III.B., the defendants have the burden of pleading and proving failure to exhaust administrative remedies as an affirmative defense in a § 1983 action. *Ray v. Kertes*, 285 F.3d 287, 295-96 (3d Cir. 2002). Their footnote asserting the failure to exhaust administrative remedies, without more, fails to meet their burden. In addition, the defendants do not address the seizure of *Ishmael* or *The Catcher in the Rye*. They summarily reject the claim for the seizure of the *Natural Cures They Don't Want You to Know About* by stating in the same footnote that it was never received by the mailroom. As will be discussed, the record contains conflicting evidence with regard to the receipt of *Natural Cures*.

On March 14, 2007, the DOC implemented a new policy with respect to incoming publications, Policy 4.5. Publications may be rejected if they depict, describe or contain activities that may lead to physical violence or group disruption; encouragement or instruction of commission in criminal activity; and sexually explicit material (e.g., sado-masochism, bestiality, involving children). Policy No. 4.5 provides that publications may not be rejected solely because they contain offensive, controversial or repugnant content; deal with sexual, health, or reproductive topics; or cover issues of concern to the lesbian, gay, bisexual and transgender communities. (D.I. 313, ex. E; ex. H inmate housing rules ¶ 6.b.)

According to Tonya Smith ("Smith"), a support services manager at the VCC, Policy 4.5 is patterned after the Federal Bureau of Prisons' policy on incoming publications. Its purpose is to balance the promotion of education and literacy with the institution's responsibility to provide a safe and secure facility. The ban on sexually explicit material is necessary for the safety and security of the VCC. According to Smith, inmates often trade, barter and sell

22

sexually explicit material to other inmates, and this conduct presents a security risk. In addition, it is believed that sexually explicit depictions are contrary to the rehabilitation of sex offenders and rapists and may contribute to other unacceptable and dangerous behaviors amongst the inmate population as a whole. (D.I. 313, ex. G.)

According to inmate Willie Wilson ("Wilson"), when he was housed at the Howard R. Young Correctional Institution ("HRYCI") in Wilmington, Delaware in 2008, it permitted nude photographs and magazines and books containing nudity to enter the prison. These items were read and viewed by the inmate population. Wilson states there were never problems among the inmates related to the books, magazines, or photographs. (D.I. 327, ex. C, Wilson aff.)

Prior to implementation of the new rule, *The Catcher in the Rye* was shipped to Fatir on January 22, 2005, but he did not receive the book, and no explanation was provided to him. (D.I. 126, ex. I.) Fatir was advised on June 25, 2006, that *Natural Cures* was never received "per the mailroom," but he was also told that the book had been received and destroyed because he failed to contact the mailroom in a timely manner. (D.I. 119, ex.; D.I. 125, ex. C.) Fatir was advised that *The Story of O* (i.e., *The Multi-Orgasmic Woman*) was deemed obscene and disposed of on January 3, 2006. (D.I. 126, ex. C.)

The State defendants' argument addresses *Shakti*, but does not address the other publications other than as discussed. The record contains invoices submitted by Fatir that show the shipment of three books to the prison: *Natural Cures*, *The Multi-Orgasmic Woman*, and *The Catcher in the Rye*. (D.I. 126, exs. G, H, I.) The court was not provided with the policy in effect at the time of that *Natural Cures*, *The Multi-Orgasmic Woman*, *The Catcher in the Rye*, and *Ishmael* were received, seized and/or disposed of by the DOC, and Smith's affidavit speaks only to the policy that became effective on March 14, 2007. Hence, the court is unable to

23

conduct an adequate *Turner* analysis of the prison regulation in effect at the time.  Because

there remain genuine issues of material fact, the court will deny the motion for summary

judgment as to Count 20.

With regard to Count 21, Warden Carroll advised Fatir on June 1, 2007, that *Shakti* was

rejected due to its sexually explicit and/or obscene material, that the book was not conducive to

the goal of rehabilitation, and presented risks to institutional safety and security.  (D.I. 313, ex.

F, G.)  By that time, Policy 4.5 had been in effect since March 14, 2007.  A prison policy

imposing on an inmate's First Amendment rights is valid if it is reasonably related to a

penological interest.  *Turner*, 482 U.S. at 89.  A four-part analysis is used to determine whether

a prison policy imposes permissible limitations on inmates' First Amendment rights.  First, the

court must "assess whether there is a 'valid, rational connection' between the prison regulation

and the legitimate governmental interest put forward to justify it."  *Wolf v. Ashcroft*, 297 F.3d

305, 307 (3d Cir. 2002) (citing *Turner*, 482 U.S. at 89).  If the court finds a legitimate and

neutral interest, and a valid and rational connection, then the analysis turns to the succeeding

three prongs: whether "alternative means of exercising the right . . . remain open to prison

inmates, the impact accommodation of the asserted constitutional right will have on guards and

other inmates, and on the allocation of prison resources generally, and, finally, whether there are

'ready alternatives' to the rule that would accommodate prisoners' rights at [a] *de minimus* cost

to penological interests."  *Id.* (citation omitted).

The record reflects that *Shakti* was not delivered to Fatir because prison officials

concluded the content of the book was sexually explicit and, therefore, posed a threat to the

safety and security to the institution.  Courts have held that security and rehabilitation concerns

are legitimate penological interests.  *See Thornburgh v. Abbott,* 490 U.S. 401, 415 (1989);

24

*Turner*, 482 U.S. at 91-92. The court concludes, therefore, that the security and rehabilitative goals advanced by the defendants are legitimate penological interests. While censorship of materials containing sexually explicit content is certainly not content-neutral in a First Amendment sense, it appears neutral and for the legitimate purpose of security and rehabilitation.

The second prong of the *Turner* test is whether the prisoners have alternative means of expression. *See Turner*, 482 U.S. at 92. Whether there are other means of expression should be viewed "sensibly and expansively." *See Thornburgh*, 490 U.S. at 417. There are no allegations that Fatir has been denied access to all publications. Therefore, the court concludes that the policy satisfies the second prong of the *Turner* test.

The court must also consider possible "ripple effect[s]" when analyzing the impact that accommodation of the right would have on third parties such as prison guards and other inmates, *Turner,* 482 U.S. at 92. The defendants indicate that the purpose of the ban on sexually explicit materials is for the safety and security of the institution. The censored materials may contribute to unacceptable and dangerous behaviors amongst the inmate population. Authorizing receipt of materials by some prisoners yet prohibiting receipt by others on an individualized basis would not solve the "ripple effect" problem and would come at the high cost of significantly less liberty and safety for prison guards and other prisoners. *See id.* Accordingly, the court concludes that the policy satisfies the third prong of the *Turner* test. The last prong requires Fatir meet his burden to prove that no adequate alternative exists for reaching his objective. If the plaintiff "can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as

25

evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 90.
This he has failed to do.

Based upon the above analysis, the court finds that Policy 4.5 effective March 14, 2007,
meets the *Turner* test. Therefore, the court will grant the defendants' motion for summary
judgment as to Count 21.

### 2.    Telephone Use, Count 23

Count 23 alleges a violation of Fatir's First Amendment rights because the current
telephone system does not allow him to place calls to England, where his wife resides, but other
inmates can call family and friends within the United States. The defendants move for summary
judgment on the grounds that Fatir does not have a constitutional right to make international
telephone calls. Fatir believes the defendants' position is unreasonable and argues that the
claims that international calls could constitute a security breach are false and absurd.

As to telephone use, inmates have First Amendment rights notwithstanding their
incarceration, but these rights are necessarily circumscribed because of the legitimate
penological and administrative interests of the prison system. *See Vester v. Rogers*, 795 F.2d
1179, 1182 (4th Cir. 1986) ("Although a prisoner does not shed his first amendment rights at
the prison portals, it is equally true that lawful incarceration brings about the necessary
withdrawal or limitation of many privileges and rights."). The exact nature of telephone service
to be provided to inmates is generally to be determined by prison administrators, subject to
court scrutiny for unreasonable restrictions." *Almahdi v. Ridge*, 201 F. App'x 865 n.2 (3d Cir.
2006) (unpublished) (quoting *Fillmore v. Ordonez*, 829 F. Supp. 1544, 1563-64 (D. Kan. 1994)
(other citations omitted).

26

Fatir submitted a grievance on October 3, 2005 complaining that the inmate telephone system does not allow for calls to other countries. His wife resides in England and a close friend lives in Dubar, but Fatir is unable to telephone them. Pierce conferred with Verizon and was advised that it was not possible for Fatir to make the calls he wanted from the current inmate telephone system. The problem has something to do with the interface with an international operator required to make the connection. It is Pierce's position that Fatir has no established right to make telephone calls to a specific location and that Fatir is free to communicate internationally via the United States Postal Service. Deputy Warden Burris ("Burris") explored other options but the inmate telephone system could not be changed to accommodate international calling. The grievances found that any other accommodations for making international telephone calls present security issues. (D.I. 313, ex. I.)

Prison officials require broad discretionary authority as the "operation of a correctional institution is at best an extraordinarily difficult undertaking." *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974). An inmate's telephone access is "subject to rational limitations in the face of legitimate security interests of the penal institution." *Strandberg v. City of Helena*, 791 F.2d 744, 747 (9th Cir. 1986)). Prison officials can limit communications, particularly telephone communications, to ensure, safety, security, and the orderly operation of their institution. *Griffin-El v. MCI Telecommunications Corp.*, 835 F.Supp. 1114, 1122–23 (E.D. Mo. 1993). In the instant case, when it was discovered that the present telephone system did not allow for international calls, prison officials explored other options in an effort to accommodate Fatir, but all other options posed security issues. Hence, due to the security issues and under the circumstances, the court finds the VCC acted reasonably in denying Fatir the right to make international telephone calls. Fatir continues to have the option of communicating by mail.

27

Based upon the foregoing, no reasonable jury could find that the defendants violated Fatir's constitutional rights. Therefore, the court will grant the motion for summary judgment as to Count 23.

### 3.    Two Book Restriction, Count 36

Count 36 alleges that the DOC's policy of restricting inmates to only two books serves no legitimate penological interest. The defendants move for summary judgment on the grounds that the limit is related to a neutral and legitimate penological interest. The defendants further contend that the VCC regulation meets the four prongs of the *Turner* test. The plaintiffs make no argument in opposition to the motion for summary judgment except to state in their "Summary" section that they "are entitled to summary judgment regarding Count 36 given that [d]efendants admit that they restrict plaintiffs to possessing only two books." (D.I. 327, ¶ 21.)

According to Hosterman, a correctional treatment administrator at the VCC, each inmate classified to minimum or medium security is allowed to have three library or personal reading books in his cell at one time. The purpose of restricting the number of books in a cell is to the limit the extent of combustible materials in the cell. The Delaware State Fire Marshal advised the VCC to limit the number of combustible materials in inmate cells to prevent fire and safety hazards. While the plaintiffs are limited in the number of publications allowed in their cells, once they have read their publications, they are allowed to donate the books and receive new books to replace the donated or discarded books. (D.I. 313, ex. D, Hosterman aff.; ex. H inmate housing rules ¶ 6.b.)

The record reflects that only Fatir was limited to two books in 2008, long after the complaint was filed. Moreover, this occurred only because personnel at the VCC realized there

28

was an error regarding the notice to Fatir for a third book. Fatir received the book as evidenced by the receipt he signed on June 27, 2008. (D.I. 146, ex. A.)

Here, the purpose of the limitation on the number of books and magazines is to prevent a fire and safety hazard and to protect the well-being of inmates. Second, although inmates are limited to the number of items they may have, nonetheless, they are allowed reading materials in their cell. Third, permitting some prisoners to have more than the requisite number of publications, yet prohibiting others would not solve the "ripple effect" problem and could lead to a potential fire and safety hazard was warned by the State Fire Marshal. The last prong requires the plaintiffs to meet their burden to prove that an adequate alternative of reaching the prison's objective exists and the plaintiff's have offered no other policy. The current policy restricting reading material in an inmate's cell does not violate the plaintiffs' First Amendment rights.

Other than allegations, the plaintiffs have produced no evidence that a two book limit was imposed upon them. Further, the court finds that the three book policy does not violate the First Amendment. In light of the evidence of record, no reasonable jury could find in favor of the plaintiffs on this claim. Therefore, the court will grant the defendants' motion for summary judgment as to Count 36.

**F.    Equal Protection, Counts 31 and 42**

Fatir and Boyer are black. In Counts 31 and 42, amended at D.I. 43, they allege that they sought jobs within the prison, but were not hired based upon their race. The defendants move for summary judgment on the grounds that there is no evidence to support the claims.

"Prisoners are protected under the Equal Protection Clause of the Fourteenth Amendment from invidious discrimination based on race." *Wolff v. McDonnell*, 418 U.S. at

556. The Equal Protection Clause requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). In order to raise a valid equal protection claim, a plaintiff must show that "he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001).

Fatir sought a position as a law library clerk.[13] Little told Fatir that he did not meet the requirements for the position based upon three write-ups Fatir had received; one in August 2005 and two in August 2006. Fatir was advised by Little that a requirement for the position "is to be write-up free." The April 20, 2006 posting for the vacancy indicates a requirement "is to be write-up free for the last 12 months preceding this announcement." (D.I. 327, exs. D, E, F, G, H.) Little does not recall why he disqualified Fatir for a job in the law library. He does not keep racial hiring statistics. Little believes the best qualified inmate should be hired regardless of the race of the inmate. (D.I. 313, ex. O at Interrogs. 8, 12, 13, 14.) When Whelan was a teacher/supervisor on average there were thirty-six aids: twenty were black, two were Hispanic, and fourteen were white. There was one black janitor who worked for Prison Education. Whelan's interrogatories state that she was unaware of any racial discrimination during 2004-2008. (D.I. 313, ex. O at Interrogs. 3, 5.)

Although the record reflects that Fatir sought, but was not hired for positions, there is no evidence of record that he was treated differently from others with whom he is similarly situated on the basis of race. Indeed, the record does not contain evidence of the person or persons who

---

[13]There is no evidence of record that Boyer applied for prison jobs.

were hired for the positions sought by Fatir or Boyer. Also, the evidence of record indicates that Little could not recall why he did not hire Fatir, but contemporaneous written documentation indicates that Fatir was not hired based upon incident reports he had received. Whelan's answers to interrogatories indicate that a large number of blacks worked under her supervision. Finally, there is no evidence that Taylor, Hosterman, Pierce, or Carroll had any personal involvement with regard to the plaintiffs' claims of discrimination.

After reviewing the record, the court concludes that no reasonable jury could find in favor of the plaintiffs with regard to their Equal Protection claim. Therefore, the court will grant the defendants' motion for summary judgment as to Counts 31 and 42.

### G. Commissary Accounts, Counts 32 and 39

The plaintiffs allege in Counts 32 and 39 that the defendants are misappropriating monies in the commissary account that belongs to the plaintiffs and the inmate population. Count 39 alleges that the plaintiffs have a right to interest accrued on the money held in inmate accounts and the inmate commissary fund. The defendants moves for summary judgment on the grounds that the plaintiffs have no standing to raise said claims. The plaintiffs contend they have standing noting they are wards of the state, and the earnings from the commissary are as much the commissary of the prisoners as is the commissary itself.

"The 'core component'" of the requirement that a litigant have standing to invoke the authority of a federal court "is an essential and unchanging part of the case-or-controversy requirement of Article III." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citations omitted). Standing contains three elements: injury in fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction bears the burden of proving standing. *Id.* at 561.

31

The first prong of standing requires an injury in fact. The plaintiffs must show that they "personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of [ ] Defendant [and] [t]he injury must be concrete and capable of being redressed by the court should [ ] Plaintiff[s] prevail on the merits.'" *Taliaferro v. Darby Twp. Zoning Bd.*, 458 F.3d 181, 188-89 (3d Cir. 2006) (quoting *Wheeler v. Travelers Ins. Co.*, 22 F.3d 534, 537-38 (3d Cir. 1994)). There is no evidence of record of an injury in fact. The plaintiffs refer to inmate accounts and the inmate commissary fund as it relates to the inmate population as a whole, not to each plaintiff individually. Nor is there any evidence of record that any of the defendants engaged in improper acts with regard to inmate accounts or the inmate commissary fund.

After reviewing the record, the court concludes that no reasonable jury could find in favor of the plaintiffs with regard to these claims. Therefore, the court will grant the defendants' motion for summary judgment as to Counts 32 and 39.

## H.    Retaliation, Count 52

Count 52, found at Docket Item 40, alleges that Bailey retaliated against Fatir for submitting a grievance. The defendants move for summary judgment on the grounds that there is no evidence of record that Bailey retaliated against Fatir. Fatir responds that, because there remains a genuine issue of material fact, summary judgment is not appropriate.

On June 30, 2007, Fatir submitted a grievance complaining that Bailey threatened him after Fatir asked Lt. Salas ("Salas") to inform him of the rules. Bailey interrupted the Salas conversation and told Fatir to submit a grievance. When Fatir submitted his grievance, Bailey ordered Fatir into his office and again threatened him. (D.I. 313, ex. J.) The allegations indicate that Bailey threatened to have Fatir transferred. It is unknown if this occurred.

32

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under § 1983." *White v. Napoleon,* 897 F.2d 103, 111-12 (3d Cir. 1990). It has long been established that the First Amendment bars retaliation for protected speech. *See Crawford-El v. Britton,* 523 U.S. 574, 592 (1998); *Milhouse v. Carlson,* 652 F.2d 371, 373-74 (3d Cir. 1981). Proof of a retaliation claim requires that Fatir demonstrate (1) he engaged in protected activity; (2) he was subjected to adverse actions by a state actor; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take adverse action. *Rauser v. Horn,* 241 F.3d 330, 333 (3d Cir. 2001) (quoting *Mt. Healthy Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *see also Allah v. Seiverling,* 229 F.3d 220 (3d Cir. 2000) (a fact finder could conclude that retaliatory placement in administrative confinement would "deter a person of ordinary firmness from exercising his First Amendment rights" (citations omitted)). "[O]nce a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." *Id.* at 334.

The evidence of record indicates that Fatir engage in protected activity when he submitted a grievance. The filing of prison grievances is a constitutionally protected activity.[14] *Robinson v. Taylor,* 204 F. App'x 155, 157 (3d Cir. 2006) (unpublished). Fatir was subjected to adverse actions when Bailey threatened him. Finally, it appears from the evidence of record that the submission of the grievance was a substantial motivating factor in Bailey's decision to

---

[14]The defendants are correct when they state that there is no constitutional right to a grievance procedure. *Woods v. First Corr. Med., Inc.*, 446 F. App'x (3d Cir. 2011) (unpublished) (citing *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991)). However, this is different from the filing of a prison grievance which is a constitutionally protected activity.

33

take adverse action.  The defendants submitted no evidence to prove that Bailey would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.

Therefore, the court will deny the motion for summary judgment as to Count 52.

## IV.  CONCLUSION

For the above stated reasons, the court will:  (1) deny the defendants' motion for summary judgment (D.I. 312) as to Counts 1, 2, 3, 4, 5, 6, 9, 12, 13, 15, 20, and 52; (2) will grant the remainder of the motion for summary judgment as to Counts 21, 23, 31, 32, a portion of count 36, 39, 42, and 45; and (3) will dismiss Boyer and Wyant as plaintiffs.

An appropriate order will be entered.

CHIEF, UNITED STATES DISTRICT JUDGE

March 30, 2013
Wilmington, Delaware

34